[No. S004760. Crim. No. 26206. Dec. 30, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID ANTHONY BREAUX, Defendant and Appellant.

**COUNSEL**

Quin Denvir, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Arnold O. Overoye and Robert R. Anderson, Assistant Attorneys General, Ward A. Campbell, Roger E. Venturi and George M. Hendrickson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—Defendant was convicted by a jury in the Sacramento County Superior Court of the murder, robbery, and kidnapping for robbery (Pen. Code, §§ 187, 211, 209)[1] of Connie Lee Decker on June 17, 1984; robbery and kidnapping for robbery (§§ 211, 209) of Greg Hardy on June 17, 1984; assault with a deadly weapon on a peace officer (§ 245, subd. (b)) on June 19, 1984; and being an ex-felon in possession of a firearm (§ 12021). The jury also found that the murder was committed under the special circumstances of kidnapping and robbery (§ 190.2, subd. (a)(17)(i) & (ii)) and that defendant had personally used a firearm in the commission of the offenses (§ 12022.5). The court imposed a sentence of death and a consecutive sentence of 10 years, 8 months. This appeal is automatic (§ 1239, subd. (b)).

## I

### GUILT PHASE EVIDENCE

A. *The Prosecution.*

In the early hours of June 17, 1984, defendant entered a liquor store which he regularly patronized in Sacramento and, at gunpoint, robbed the cashier, Greg Hardy, of $200. Defendant ordered Hardy out of the store and threatened, "I'll kill you right here," when Hardy refused his order to get in a vehicle parked nearby. Hardy was released several blocks away. Hardy described defendant to the police, stating that he noticed nothing unusual about defendant, his walk, his manner of speech, or his physical actions.

At 5:30 p.m. of the same day defendant drove a maroon Corvette to a gas station and liquor store near Sacramento and, leaving a young woman passenger in the vehicle, hurriedly entered to leave $5 for gas. Paul Brown, cashier, noticed his haste and uneasiness, but nothing unusual about his speech or walk.

Tony Cox, assistant manager, observed that, while defendant was pumping the gas, a young woman at the phone booth was mouthing the words, "Help me." Defendant grabbed her by the hand and took her to the car. The woman continued to look at Cox, repeatedly mouthing, "Help me." As defendant sped away, Cox recorded the license number as CONNN182. Police shortly thereafter determined that a similar number (CONN182) was registered to Connie Decker.

---

[1]All statutory references herein are to the Penal Code unless otherwise indicated.

Connie Decker's body was found about 8 o'clock the next morning inside a chain link fence near a road in Rancho Cordova. There was evidence that the body had been dragged between the road and the fence. Dr. Hall, at the scene, concluded, based on discoloration from blood pooling, that Decker had been killed at another location. Following an autopsy, Dr. Hall estimated that Decker had been killed in the afternoon of June 17 and stated the cause of death as a gunshot to the head.

On the afternoon of June 17 defendant borrowed a Thunderbird and, about 3 or 4 p. m., returned with a maroon Corvette, license plates "CONN182." He told a companion that he had pulled a gun on a lady at a liquor store and had driven her to the outskirts of town and "dumped her off." The companion remarked that the lady must be crying about her car; defendant replied that he did not think so. Defendant also stated that he was going to change the plates on the car because they were "too conspicuous."

A friend saw defendant in the Corvette at 8 p.m. on the evening of June 17. And shortly after 10 p.m. on the same evening, defendant filled a Corvette with gas. He attempted to pay with Decker's credit card. When told the card had expired, defendant made an excuse, wrote the vehicle's license number (1J80564) on the credit slip, and told the attendant he lived nearby and would get the cash. He never returned.

On the following day the police found the laundry truck from which the substitute plates had been taken. They had also found the Corvette.

The police set up a surveillance near the residence of defendant's mother and, in the early hours of June 19, defendant was observed in the vicinity. He ran when the officers approached and was chased on foot to a clubhouse in a nearby park. Cornered on the roof, he broke into the building, barricaded himself and, pointing a gun at the officer who had entered the building, said, "Back off, or I'll shoot." In the course of the standoff, which lasted 45 minutes, defendant resisted offers to surrender and at one point said, "This is the gun that killed her, but I didn't do it." A SWAT officer shot defendant in the arm and leg to disarm him.

On his arrest, defendant did not appear to be under the influence of anything; the officer who had chased him noted that defendant had no problems running and appeared to be in good physical condition. After treatment at the emergency hospital, defendant waived his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] and agreed to talk with a deputy sheriff. He admitted taking Decker's car at gunpoint for a "joyride." He related the following: Decker was killed by a "Mexican hitchhiker" whom defendant picked up on the

interstate. He had left the Mexican and the girl to go "joyriding." In his absence the Mexican had shot Decker and put her in a dumpster. He and the Mexican changed the license plates and he "showed off" the car to his mother and friends. On the following day he and the Mexican moved the body from the dumpster to the place where it was found.

Search of the dumpster revealed items of Decker's clothing, a .32-caliber cartridge case, and a quantity of blood. The murder weapon was found, a .32 automatic pistol which belonged to a friend of defendant.

### B. *The Defense.*

The persons with whom defendant lived in May and until June 10, 1984, testified that he was "hyper" and "paranoid." He sold drugs and carried a gun. Defendant was asked to leave when he cooked what appeared to be drugs on a spoon in the house and when he left his gun on the coffee table. James Henderson, a friend, agreed that before the murder defendant "started gettin' paranoid," and stated that defendant became a heroin addict "very quickly."

Tina Francis, a prostitute, met defendant shortly before the murder. They were together five or six days (or maybe only two) and purchased drugs with the money she earned by prostitution. Defendant injected cocaine 10 or 12 times a day, became explosive and angry for 30 to 45 minutes after he injected and became increasingly paranoid. The two were arrested on June 12 for being under the influence of heroin. She was in jail for six days and, on her release on June 18, she saw defendant with a red Corvette. He told her that he and another person had robbed a lady and taken the car. He also told her that the other person had shot the lady. Tina thought defendant was lying and suspected that he had committed the murder himself. She rejected his demand to become her "pimp" and later heard he had been arrested.

When he was arrested, defendant had a hypodermic injection kit in the pocket of his jacket. The syringe and the spoon had residue of cocaine and Ritalin. After his arrest (and before receiving a morphine injection in the emergency room), defendant gave a urine specimen which showed morphine or heroin, and cocaine.

Dr. Fred Rosenthal, defense psychiatrist, testified that, due to his heavy cocaine use and lack of sleep, defendant did not intend or premeditate the shooting of Decker. At the time of the shooting, the psychiatrist asserted, defendant was reacting impulsively and irrationally, he was frightened and paranoid, and his mental state was inconsistent with deliberation and premeditation. Dr. Rosenthal based his opinion largely on defendant's statements to him. Defendant told the psychiatrist that he kidnapped Decker to

steal her car; he put her in a dumpster to delay her in reporting the theft to the police; he injected himself with cocaine and, when she banged on the lid of the dumpster, he flew into a rage and shot her.

## C. *Prosecution Rebuttal.*

Detective Bell testified that Tina Francis told him that she only knew defendant for two days before they were arrested together.

Tom Brown, investigator, testified that Jackie Henderson told him that he was watching television with defendant when the news of the discovery of Decker's body was broadcast. Defendant said at that time, "Oh, no, they've found her. They found her already. Damn. I thought it would take them longer to find her." Henderson asked defendant if he really did it. Defendant responded that he had no other choice, that he had to do it.

## II.

### PRETRIAL ISSUES

## A. *Recusal Motion.*

Defendant moved to recuse the entire district attorney's office or, in the alternative, David Druliner, the deputy who prosecuted the case after August 1986. A conflict of interest allegedly existed because of connections or contacts by friends of the murder victim with the prosecutors. Defendant based his motion on the following: (1) the acquaintance of Druliner's wife with the victim; (2) Druliner's contacts with the social club of which the victim was a member and the club's interest in the case; and (3) the relationship between the victim and Craig Regan, a former deputy district attorney and municipal court commissioner who was acquainted with the prosecutors.

After an extensive hearing, the trial court found (1) no evidence that Mrs. Druliner attempted to influence her husband in any way; (2) no evidence that the social club put any pressure on the district attorney's office or that the office was influenced by the social club; and (3) that Commissioner Regan did not exert any pressure on the district attorney's office. The court found that there was no showing of a conflict of interest or reasonable appearance of a conflict or that it was likely defendant would not receive a fair trial.

Our role is to determine whether there is substantial evidence to support the findings (*People* v. *Conner* (1983) 34 Cal.3d 141 [193 Cal.Rptr.

148, 666 P.2d 5]) and, based on those findings, whether the trial court abused its discretion in denying the motion. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 140 [249 Cal.Rptr. 320, 756 P.2d 1348]; *Love* v. *Superior Court* (1980) 111 Cal.App.3d 367, 371 [168 Cal.Rptr. 577]; *People* v. *Battin* (1978) 77 Cal.App.3d 635, 671 [143 Cal.Rptr. 731, 95 A.L.R.3d 248].)

In *People* v. *Superior Court* (*Greer*) (1977) 19 Cal.3d 255, 269 [137 Cal.Rptr. 476, 561 P.2d 1164] (*Greer*), we held that a trial court had the inherent power to recuse the district attorney when it appeared he had "a conflict of interest which might prejudice him against the accused and thereby affect, or appear to affect, his ability to impartially perform the discretionary functions of his office." We held recusal had been permissibly ordered when the murder victim's mother was a clerical employee of the district attorney's office and sympathy for her had permeated the office.

The Legislature responded to *Greer* by adopting section 1424, which provides that a motion to recuse the district attorney "shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial." We have noted that the statute differs somewhat from the *Greer* rule, requiring a showing on the potential effect of the conflict on the trial. (*People* v. *Conner*, *supra*, 34 Cal.3d 141; *People* v. *Hamilton*, *supra*, 46 Cal.3d 123.) In *Conner* we suggested that, although the Legislature had not necessarily eliminated recusals on the mere appearance of a conflict, whether actual or apparent, "the conflict must be of such gravity as to render it unlikely that defendant will receive a fair trial unless recusal is ordered." (34 Cal.3d at p. 147.)

■ The trial court's findings and ruling were entirely consistent with the standards articulated in the judicial pronouncement of *Greer*, *supra*, 19 Cal.3d 255, and the legislative pronouncement of section 1424. Defendant argues that there is a "reasonable possibility" that the district attorney's discretionary powers, especially in terms of plea bargaining, may have been affected by the contacts and connections of the prosecutors with the victim. The simple answer is that the trial court heard the evidence and found otherwise.

As to Mrs. Druliner's acquaintance with the murder victim, the trial court noted that she was not called as a witness to state her feelings toward the victim or the disposition of the case. Druliner testified that he did not even know his wife was acquainted with the victim until the recusal motion. On inquiry, Mrs. Druliner told her husband that she had spoken to the victim "on occasion" at the social club. Druliner himself had never met the victim; he testified he had no personal interest in the case.

As to the social club and its interest in the case, the trial court refused to equate "interest" with "pressure," noting that recusals would abound if required whenever a group feels strongly about an issue and attempts to communicate that to the district attorney. John O'Mara, the deputy who made the initial recommendation in filing charges in the case and was involved in the decision to seek the death penalty, responded to the initial call from a member of the social club. He informed the member that there would be no plea bargain and that a jury should decide on the appropriate penalty. He had no other discussion regarding a negotiated disposition, and the club exerted absolutely no pressure on him regarding the handling of the case. Several months after the murder, Druliner was asked to address the social club on the criminal process involved in a murder case. He agreed, with the understanding that he could not and would not discuss the case. At the time, Druliner was not assigned to the case.

Regarding the alleged pressure exerted by Commissioner Regan, a friend of the murder victim, the record reveals that his connections with the prosecutors handling the case were weak and tenuous and that he did not influence or attempt to influence anyone.

The evidence simply fails to show any connection between the friends of the victim and the prosecutor's office which required the trial court to draw even an inference of bias by the office or Druliner. As the Attorney General points out, the fact that the victim had friends, some of whom felt that her murderer should receive the death penalty, does not make this case different from most murder cases and provided no support for the recusal motion.

Accordingly, we conclude that the trial court did not abuse its discretion in denying the motion.

B. *Jury Selection—Representative Jury.*

 Defendant contends that the denial of his motion to quash the jury venire deprived him of his right to a jury drawn from a fair cross-section of the community, guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution and by article I, section 16, of the state Constitution. The motion was directed to the alleged underrepresentation of Hispanics or persons of Spanish origin.

 ██ The defense expert at the hearing on the motion to quash, Edwin Butler of the University of California at Riverside, conceded that the

master list fairly represented the Hispanic population of the county.[2] The jury-eligible Hispanic population of Sacramento County in the 1980 federal census was 7 percent. From a random selection survey of persons on the master list, Butler found that 8.5 percent identified themselves as Hispanic.

Butler's survey of persons who appeared at the courthouse from April 21 to September 9, 1986, revealed, however, that only 4.8 percent were Hispanic. Butler testified to possible sources of the disparity between the proportion of Hispanics on the master list and the proportion on the venires. He first noted that there was no disparity in the proportion of Hispanic versus non-Hispanic for whom questionnaires were returned as undelivered (the "unreachables"). There was a slight disparity among the two groups as to the numbers who responded to the survey. Butler suggested that any underrepresentation of Hispanics due to failure to respond could be alleviated by better "tracking" and "follow-up."

Butler found no fault with the jury commissioner's practices regarding exemption of prospective jurors, but opined that the policy and practices regarding statutory criteria for qualification (e.g., residence, language, felon status, etc.) and discretionary nonstatutory excusals of otherwise qualified prospective jurors could be the cause of underrepresentation. Butler admitted, however, that he could only speculate as to the effect of those factors in this case.

Jury Commissioner Geraldine Alphson and an assistant testified to the method of selecting prospective jurors: The master list is composed from two sources, the Department of Motor Vehicles and the county registrar of voters. From questionnaires mailed to each prospective juror (Code Civ. Proc., former § 204.4), the commissioner eliminates persons entitled to statutory exemption and those whose responses indicate they do not meet the minimum statutory requirements to be a juror (i.e., citizenship, residence, language skills). Requests for excusal, and the explanations supporting the requests, are evaluated by the commissioner's staff under local court rules and pursuant to written procedural guidelines. Except in a few situations where there is no doubt as to the right to excusal, all hardship and other discretionary excuses are examined by the jury commissioner or by the presiding judge.

---

[2]For clarity we use the following terms to describe the stages in selection of jurors: The "master list" is the compilation of eligible jurors. A "venire" is the group of prospective jurors summoned from the master list. A "panel" is the group of jurors from the venire assigned to a court for selection of the trial jury. (See *People* v. *Bell* (1989) 49 Cal.3d 502, 520, fn. 3 [262 Cal.Rptr. 1, 778 P.2d 129].)

Persons who do not return the questionnaire are sent a form letter and a second questionnaire, and third notices are also sent by certified mail. Persons who fail to respond to summons for jury duty are telephoned or are resummoned with certified mail. An order is issued to any person who refuses to appear. The jury commissioner testified that there is a follow-up on every person summoned for jury duty.

The trial court denied the motion to quash on the basis that no prima facie showing of unconstitutional representation had been made. The trial court accepted a comparative disparity figure of between 31 and 33 percent but noted that the absolute disparity was 2.2 percent, which translated into five to six people in the venire of two hundred and forty persons.[3] The trial court found "no intentional disparity" and also found that the cause of the disparity could not be identified. Applying the "substantial evidence" standard in evaluating the facts before the trial court and applying the "deferential abuse-of-discretion" standard in evaluating the court's ruling on the motion, we uphold the ruling of the trial court.

■ In California, the right to trial by a jury drawn from a representative cross-section of the community is guaranteed equally and independently by the Sixth Amendment to the federal Constitution (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692]) and by article I, section 16 of the California Constitution. (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748]; *Williams* v. *Superior Court* (1989) 49 Cal.3d 736, 740 [263 Cal.Rptr. 503, 781 P.2d 537]; see also Code Civ. Proc., §§ 197, subd. (a), 204.)

Under *Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664] (*Duren*), in order to establish a prima facie violation of the fair cross-section requirement, "the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not

---

[3]The "absolute disparity" and "comparative disparity" tests are among the several statistical tests that have been employed by experts and acknowledged by the courts. The "absolute disparity" test measures representativeness by the difference between the proportion of the population in the underrepresented category and the proportion of those persons in the source or pool in the underrepresented category. The "comparative disparity" standard is more complex, and the disparity is obtained by using the formula:

$$\frac{A \text{ less } B}{A} \times 100$$

A represents the percentage of the community that makes up the cognizable group, and B represents the percentage of the jury venire which is composed of the cognizable group. (See Kairys et al., *Jury Representativeness: A Mandate for Multiple Source Lists* (1977) 65 Cal.L.Rev. 776, 789-791; *People* v. *Bell, supra,* 49 Cal.3d 502, 527, fn. 14; *People* v. *Sanders* (1990) 51 Cal.3d 471, 492, fn. 5 [273 Cal.Rptr. 537, 797 P.2d 561].)

fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Id.* at p. 364; *People* v. *Harris* (1984) 36 Cal.3d 36, 50 [201 Cal.Rptr. 782, 679 P.2d 433].)

■ The parties are in agreement that the first prong of the *Duren* test is met, i.e., that Hispanic or Spanish-origin persons are a cognizable group for purposes of fair cross-section analysis. (*People* v. *Sanders, supra,* 51 Cal.3d 471, 491; *People* v. *Morales* (1989) 48 Cal.3d 527, 543 [257 Cal.Rptr. 64, 770 P.2d 244].)

Defendant argues that the second prong of the *Duren* test is also met, i.e., that the number of Hispanics on the venires is not fair and reasonable in relation to the number of Hispanics in the population. Defendant relies primarily on a comparative disparity measure, which in this case ranges from 31 to 37 percent, depending on whose figures are accepted. The People, on the other hand, rely on *People* v. *Bell, supra,* 49 Cal.3d 502, in which we found it "far from clear" that an absolute disparity of 5 percent satisfied the second prong of *Duren.*

In *Bell* the comparative disparity was over 50 percent, the absolute disparity 5 percent. In *Sanders, supra* (51 Cal.3d 471), our most recent decision on this issue, the comparative disparity was almost 50 percent, the absolute disparity 8 percent. In both cases, we noted that the federal high court "has not yet spoken definitively on either the means by which disparity may be measured or the constitutional limit of permissible disparity" (*People* v. *Bell, supra,* 49 Cal.3d at pp. 527-528, fn. omitted; *Sanders, supra,* 51 Cal.3d at p. 492), and we found it unnecessary to decide which measure was appropriate for determination of the "fair and reasonable" component of the second prong of *Duren,* because in both *Bell* and *Sanders* the defendant had failed to make out a prima facie case under the third prong, i.e., a showing that the disparity was caused by "systematic exclusion" of the allegedly discriminated against group.

Here, too, defendant has not met his burden under the third prong of *Duren, supra,* 439 U.S. 357. Defendant has submitted a statistical disparity and an expert opinion that mere chance is unlikely to have produced such a disparity. Although the expert was willing to speculate that the disparity resulted from the process used to select prospective jurors, he admitted that he had no evidence and could only speculate as to the cause of the disparity. Butler suggested that application of the statutory criteria, especially language and residence, might have had an effect on the disparity. He also speculated that there might have been inconsistencies in the granting of

discretionary excusals. As the trial court, found, however, defendant provided no evidence that Hispanics were granted a disproportionate number of exemptions or excusals. More importantly, there was no showing that the exemptions or excusals were granted other than for race-neutral reasons.

The trial court in *People* v. *Morales, supra,* 48 Cal.3d 527, made a similar finding. In that case, we agreed with the trial court that insofar as the disparity " 'may be due to economic, cultural, social or language considerations, the difference must be deemed to be "unavoidable." ' " (*Id.* at p. 547.) We concluded, "defendant merely showed possible laxity in enforcing race/ class *neutral* excusal practices. Such a showing fails to constitute a prima facie case of systematic exclusion of those minority groups affected by such practices." (*Id.* at p. 549.) Later, in *People* v. *Bell, supra,* 49 Cal.3d 502, we held that the defendant failed to carry his burden of establishing a prima facie case under the third prong of *Duren* where the only evidence proffered was statistical evidence of underrepresentation and testimony by the jury commissioner regarding the jury selection process. We rejected defendant's claim that constitutionally impermissible systematic exclusion could be shown by demonstrating that underrepresentation of a cognizable class is the result of applying neutral criteria to grant deferrals on grounds of hardship.

In sum, the trial court properly denied defendant's challenge to the jury venire.

### III

### GUILT PHASE ISSUES

A. *Admissibility of Postarrest Statement.*

Defendant contends that the trial court erred in failing to suppress a statement made to police at the University of California at Davis Medical Center following his arrest on the morning of June 19, 1984. Defendant challenged the admissibility of the statement on the ground that it was involuntary in that he lacked the mental capacity to waive his *Miranda* (*Miranda* v. *Arizona, supra,* 384 U.S. 436) rights due to the effect of morphine administered at the hospital. We conclude that there is ample support for the trial court's finding that the waiver of *Miranda* rights was knowing and voluntary.

Defendant was arrested after a chase and standoff, in the course of which he was shot in the arm and the thigh. Defendant was treated for an hour in the emergency room and, to reduce his pain, was given an injection of

morphine. Thereafter Detective Bell of the Sacramento Sheriff's Department, who had accompanied defendant to the hospital, advised him of his *Miranda* rights, and defendant signed and dated a form waiving the rights. Following another half-hour medical examination, Bell commenced his interview of defendant. In the tape-recorded interview, which lasted about an hour and a half, defendant related his story of a Mexican hitchhiker who allegedly was left to guard the victim and instead shot her to death in a dumpster.

The medical personnel who attended to defendant before and during the interview testified at the hearing on the motion to suppress. Dr. Gylling and Nurse Lords treated defendant in the hour prior to the *Miranda* advisements, and Nurse Lords was standing several feet from defendant when Bell informed defendant of his rights.

Dr. Gylling testified that defendant's wounds were not life threatening and he estimated that defendant was in moderate pain. Defendant appeared coherent, appeared to understand completely what was said to him, and gave a detailed past history. Defendant told the doctor that he had injected heroin that day, but he showed no signs of being under the influence of heroin. To alleviate his pain, Gylling gave defendant a "small dose" of morphine, insufficient to mask symptoms or to interfere with defendant's ability to give informed consent to surgery. The morphine did not affect defendant's level of consciousness; he appeared awake, conscious, and aware throughout the medical examination, from 5:30 a.m., when the dosage was administered, until 6:15 a.m., when the doctor departed. The effects of morphine last from one to two hours; the doctor testified that the effects would have decreased after he left defendant.

Nurse Lords remained with defendant until he was taken to the jail ward at 7:20 a.m. Defendant was informed of his rights at 6:30 a.m.; he appeared alert and oriented. She testified that the officers did not use an intimidating tone and that defendant did not appear intimidated at all. He spoke slowly in a normal conversational voice and spoke as loudly as the officers. The officers' interview was interrupted by a half-hour neurologic examination conducted by Dr. Gage.

Dr. Gage testified that defendant did not appear intimidated and was assertive with hospital staff; he asked a lot of questions and gave complete and in-depth answers to question posed to him. The doctor felt that defendant was competent to give informed consent to surgery.

Detective Bell interviewed defendant sometime after 7 a.m, almost two hours after the morphine injection; at that time defendant appeared to

understand the questions, he was responsive, and his answers were prompt, detailed, and pertinent.

Defense psychiatrist Dr. Mehtani testified, after reviewing material supplied to him by defense counsel, that it was "very difficult" for defendant to make a voluntary statement or voluntarily waive his rights. His opinion was based primarily on defendant's lack of sleep for several days, his pain and shock from the gunshot wounds, and his abuse of heroin and cocaine in the period prior to the crime. Mehtani opined, however, that defendant's consent to surgery was knowing, intelligent, and voluntary, and he conceded that defendant was well versed in the *Miranda* rights, having exercised them in the prior week when arrested for being under the influence of heroin and while under the influence of heroin.

The trial court ruled that the "Miranda waiver at the hospital was given knowingly, intelligently and voluntarily," finding that, based on the testimony of the two physicians and the nurse, "there was no question . . . concerning the competency of the defendant . . . no indication of undue pressure." The trial court also noted that Dr. Mehtani's opinions were not supported in the record other than by the self-interested statements made to the doctor by defendant himself.

Defendant's contentions are strikingly similar to those made and rejected in *People* v. *Jackson* (1989) 49 Cal.3d 1170 [264 Cal.Rptr. 852, 783 P.2d 211], where the claim of incapacity or incompetence to waive *Miranda* rights was premised on the defendant's physical and mental condition due to his confrontation with police officers and his ingestion of drugs. However, there as here, there was nothing in the record to indicate that the defendant did not understand the questions that were posed to him. (See also *People* v. *Marshall* (1990) 50 Cal.3d 907, 924-925 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Hendricks* (1987) 43 Cal.3d 584, 591 [238 Cal.Rptr. 66, 737 P.2d 1350]; *In re Cameron* (1968) 68 Cal.2d 487 [67 Cal.Rptr. 529, 439 P.2d 633]; *People* v. *Loftis* (1984) 157 Cal.App.3d 229, 236 [203 Cal.Rptr. 590].)

We find no error in the trial court's ruling.

B. *Evidentiary Rulings.*

Defendant contends that the trial court on two occasions erroneously excluded evidence in violation of his constitutional rights to present a defense and to due process.

1. *Exclusion of Statements by Tina Francis.*

Defense witness Tina Francis testified that she had spent five or six days with defendant before they were both arrested for being under the

influence of heroin on June 12, 1984, five days before the murder. In rebuttal, Detective Reed testified that, in a taped police interview with police 11 days after the murder, Francis stated that she had met defendant 2 days before they were arrested. On cross-examination of Reed, defense counsel attempted to elicit other statements made during the interview, claiming they were admissible (1) as prior consistent statements (Evid. Code, § 791)[4] and (2) as part of a conversation already in evidence (Evid. Code, § 356).[5] The trial court denied admission under section 791 and, as to section 356, limited the admission of the remainder of the interview to statements that were relevant, i.e., on the "same subject."

The trial court did not err. Under Evidence Code section 791, subdivision (a), defendant was entitled to elicit prior statements regarding when Tina Francis came to Sacramento and how long she knew defendant. Statements to that effect were not excluded. As to subdivision (b), the trial court acted within its discretion when it concluded, on the facts, that there was no bias or motive to testify in a particular way and that the evidence suggested only that the witness had been mistaken in her trial testimony as to how many days she spent with defendant.

The trial court also properly limited the admission of the remainder of the interview under Evidence Code section 356. The section permits introduction only of statements "on the same subject" or which are necessary for understanding of the statements already introduced. The "other conversation" referred to in Evidence Code section 356 must have some bearing upon, or connection with, the admission or declaration in evidence. (See *People* v. *Ketchel* (1963) 59 Cal.2d 503, 536 [30 Cal.Rptr. 538, 381 P.2d 394]; *Rosenberg* v. *Wittenborn* (1960) 178 Cal.App.2d 846, 852 [3 Cal.Rptr. 459].)

The record reveals that, after an extensive discussion and review of the entire interview transcript, the trial court permitted the introduction of everything that remotely related to the time Francis spent with defendant.

---

[4]Evidence Code section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:

"(a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or

"(b) An express or implied charge has been made that his testimony at the hearing is recently fabricated . . . ."

[5]Evidence Code section 356 provides in pertinent part: "Where part of [a] . . . conversation . . . is given in evidence by one party, the whole *on the same subject* may be inquired into by an adverse party; . . . when a detached . . . conversation . . . is given in evidence, any other . . . conversation . . . *which is necessary to make it understood* may also be given in evidence." (Italics added.)

## 2. *Limitation of Psychiatrist Testimony.*

■ Defense counsel sought a ruling from the trial court on whether the defense expert, a psychiatrist, would be permitted to testify as to whether defendant had premeditated and deliberated at the time of the killing. The court indicated it would not permit such testimony, citing section 29.[6] At trial, counsel argued only that the section was unconstitutional. On appeal, he argues that section 29 has no application because the testimony of the psychiatrist had nothing to do with "defendant's mental illness, mental disorder, or mental defect." Rather, the psychiatrist was prepared to testify only to the effect of drug usage, sleep deprivation, and rage on defendant's mental state.

Defendant does not indicate how the allegedly "erroneous" ruling affected the trial or prejudiced defendant. Without deciding whether the psychiatrist's testimony fell within the proscription of section 29, we merely note that he did testify about the symptoms of psychosis due to cocaine and stated that defendant had those symptoms; he described the disorganizing effects of defendant's cocaine use and sleep deprivation and the resulting paranoia, explosiveness, and anger. He testified fully as to his opinion of defendant's condition before and at the time of the murder. He stated that defendant's mental state was inconsistent with premeditation. He opined that defendant could not and did not premeditate the shooting. In his opinion, defendant shot the victim while in an "enraged" state, and the doctor equated rage with lack of intent.

Defendant points to no evidence that was excluded by the court's ruling. We conclude that there was no interference with defendant's rights to present a defense and to due process in the court's ruling on the psychiatrist's testimony.

### C. *Instructions on Consciousness of Guilt.*

Over defense objection, the trial court gave two instructions on consciousness of guilt, CALJIC Nos. 2.03 and 2.06. The jury was instructed that a false or deliberately misleading statement by defendant concerning the charge upon which he was being tried (CALJIC No. 2.03) or an attempt by defendant to suppress evidence against himself (CALJIC No. 2.06) could be considered to prove consciousness of guilt, that the evidence was not

---

[6]Section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

sufficient of itself to prove guilt, and that its weight and significance, "if any," were matters for the jury's determination.[7]

■ Defendant contends here as he did before the trial court that, while the two factors might be relevant to whether he committed the crimes, they were irrelevant to the only issue in dispute, his mental state at the time of the offense. Defendant argues that the instructions, at the very least, confused the jury, permitting it to draw irrational and irrelevant inferences about his state of mind at the time of the offenses in contravention of federal and state constitutional guarantees of due process. (See *United States* v. *Gainey* (1965) 380 U.S. 63 [13 L.Ed.2d 658, 85 S.Ct. 754]; *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881].)

We addressed the same two instructions and rejected the identical due process argument in *People* v. *Crandell* (1988) 46 Cal.3d 833 [251 Cal.Rptr. 227, 760 P.2d 423]: "The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions *do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto.*" (*Id.* at p. 871, italics added; see also *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 579-580 [286 Cal.Rptr. 628, 817 P.2d 893].)

Furthermore, although counsel notes that defendant "essentially conceded" his guilt to the seven nonmurder counts as well as the killing of the victim, the fact remained that defendant did not plead guilty to any of the charges and the jury had before it the issue of guilt on all the charges. In *People* v. *Griffin* (1988) 46 Cal.3d 1011 [251 Cal.Rptr. 643, 761 P.2d 103], where the defendant conceded killing his stepdaughter but denied sexually assaulting her, he disputed the propriety of giving CALJIC No. 2.03 regarding false statements concerning the stepdaughter's whereabouts. We disagreed that the only issue remaining was whether he had committed the sex crimes: "First of all, his concession was not tantamount to a guilty plea . . . and the jury still had to determine whether or not he had committed a murder, and of what degree any murder was. Furthermore, defendant has provided no authority, nor have we found any, to support the proposition that a statement only supports an inference of consciousness of guilt if it mentions the particular offense, committed during a single transaction, about which the defendant feels guilty." (46 Cal.3d at p. 1027.)

---

[7]CALJIC No. 2.03 was directed to defendant's postarrest statements at the hospital. CALJIC No. 2.06 was directed primarily to defendant's postoffense conduct in substituting the license plates on the victim's car.

We conclude the trial court made no error in instructing on consciousness of guilt.

### D. *Prosecutorial Misconduct—Closing Argument.*

 Defendant claims that the prosecutor engaged in misconduct during closing argument. It is argued that the prosecutor impugned the integrity of defense counsel and thereby violated defendant's Sixth Amendment right to counsel. We disagree.

During his rebuttal argument, while discussing the reasonableness of inferences to be drawn from circumstantial evidence, the prosecutor compared the trial with a law school trial tactics class where students are taught "that if you don't have the law on your side, argue the facts. If you don't have the facts on your side, argue the law. If you don't have either one of those things on your side, try to create some sort of a confusion with regard to the case because any confusion at all is to the benefit of the defense." Defense interrupted to object on Sixth Amendment grounds and also claimed it was an argument of facts outside the record. The trial court overruled the objection, stating, "I will instruct the jury, however, that any argument that relates to facts that are not on the record should be disregarded by the jury."

Later, during a recess, defense counsel restated his objection to the prosecutor's statements as improper argument, demeaning counsel and impugning his integrity. He asked the court to instruct the prosecutor not to again attack the character of defense counsel. The court disagreed that the comment was improper, noting it was "very common in trials" for one counsel to impugn the motivations of the other, as defense counsel had done in his argument. "[T]his is the observation and opinion of counsel in an adversary type position. I don't think it has gone too far. Of course, there are bounds upon that. But I don't think it has gone to the point where it would deprive Mr. Breaux of his Sixth Amendment rights."

Defendant suggests that the single comment by the prosecutor is misconduct in the nature of that condemned in cases such as *People v. Bain* (1971) 5 Cal.3d 839, 847 [97 Cal.Rptr. 684, 489 P.2d 564], *People v. Perry* (1972) 7 Cal.3d 756, 789 [103 Cal.Rptr. 161, 499 P.2d 129], and *Bruno v. Rushen* (9th Cir. 1983) 721 F.2d 1193, 1194-1195. On the contrary, *Bain* was an extreme case of prosecutorial misconduct: "In the course of the trial, the prosecutor asserted before the jury that the defendant and his counsel had fabricated the 'pick-up' story; he stated that he, as a black man, would not be prosecuting a black defendant unless he personally believed the man to be guilty; he attacked the integrity of the defense attorney and the office of the

public defender; and he referred repeatedly to racial matters." (5 Cal.3d at p. 845.) In *Perry,* the prosecutor argued that, in contrast to prosecutors, defense attorneys were free to obscure the truth and confuse the jury; he accused counsel of unethical conduct. (7 Cal.3d at pp. 789-790.) In *Bruno,* the prosecutor argued that defense attorneys are trained to lie; he suggested that counsel suborned perjury; and he stated that defendant's hiring of counsel indicated his guilt. The instant case finds no parallel in these decisions.

*People* v. *Bell, supra,* 49 Cal.3d 502, however, is instructive. There the prosecutor commented that it was defense counsel's job to confuse the jury and throw sand in its eyes to prevent it from returning a verdict. The prosecutor *also* commented that " 'It's a very common thing to expect the defense to focus on areas which tend to confuse . . . that's all right. . . .' " (*Id.* at p. 538.) We held that, insofar as the prosecutor's remarks could be understood as a reminder to the jury that it should not be distracted from the relevant evidence and inferences that might properly and logically be drawn therefrom, there was no impropriety. The argument was improper only if it could be understood as suggesting that counsel was obligated or permitted to present a defense dishonestly.

We are persuaded that, in context, the prosecutor could only have been understood as cautioning the jury to rely on the evidence introduced at trial and not as impugning the integrity of defense counsel. The trial court did not err in finding no misconduct.

### E. *Other Errors Affecting Guilt Phase.*

In a supplemental brief, defendant raises three issues which he recognizes have been rejected in recent decisions by this court.

#### 1. *Death Qualification and an Impartial Jury.*

Death qualification and the resulting excusal of several prospective jurors for cause based on their views on the death penalty produces a jury which is substantially more likely to convict than a non-death-qualified jury and is therefore not neutral and impartial in determining the issue of defendant's guilt or innocence. This oft-made challenge has been rejected by us (*People* v. *Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741]) and by the United States Supreme Court (*Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]).

#### 2. *Concession of Guilt by Defense Counsel.*

Defendant contends that his counsel's argument to the jury contained statements which amounted to a concession of guilt in violation of defendant's constitutional rights. While an attorney may not plead his client guilty

(§ 1018), trial strategy and tactics here support counsel's decision to concede guilt on all but the murder count and to urge a lesser verdict on that count: "This is not a trial about is Mr. Breaux guilty or not guilty. This is a trial about what Mr. Breaux is guilty of . . . the question is [is] he guilty of first degree murder or second degree murder or manslaughter." Similar contentions were rejected by us in *People* v. *Griffin, supra,* 46 Cal.3d 1011, 1029, and *People* v. *Hendricks, supra,* 43 Cal.3d 584, 592-594.

### 3. *Defendant's Absence from Proceedings.*

The record reveals that all the proceedings of which defendant now complains were preceded by an oral waiver of personal presence by defendant. Defendant's contention that federal due process precludes the power to waive presence at proceedings of a capital trial and that the trial court has no power to allow his absence has been rejected by us in *People* v. *Grant* (1988) 45 Cal.3d 829, 845-846 [248 Cal.Rptr. 444, 755 P.2d 894]. (See also *People* v. *Cooper* (1991) 53 Cal.3d 771, 825 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1238 [283 Cal.Rptr. 144, 812 P.2d 163].)

### IV.

#### PENALTY PHASE EVIDENCE

### A. *The Prosecution.*

The parties stipulated to the reading of a statement of facts on three prior offenses, two of which had been pleaded as prior convictions and found true at the guilt phase. On April 28, 1975, defendant assaulted a police officer who was attempting to arrest him for disorderly conduct (§ 647, subd. (f)). On June 28, 1976, defendant committed a misdemeanor battery (§ 242) on a young woman whom he assaulted as she stopped for a red light at an intersection in Sacramento. On May 25, 1978, defendant committed an armed robbery (§ 211) of a 7-Eleven store in Fair Oaks.

### B. *The Defense.*

The defense presented mitigating evidence through the testimony of members of defendant's family and friends. Defendant's father testified that the family moved frequently while he served as an officer in the Air Force; that, as a youth, defendant excelled in sports, but started to "change" in 11th grade when his grades dropped; and that, although defendant drank beer and smoked cigarettes, as far as he knew defendant did not take drugs in high

school. The father described the family as "very close." He testified to good relationships with his children; he recognized they were "unhappy" but did not know why. He left the family in 1976.

Defendant's mother described a stressful period for the family in Japan and the deterioration of the marriage upon their return to Sacramento in 1970. The mother believed that her husband was sexually molesting their daughter, who, like defendant, was an avid swimmer and athlete. Defendant and his sister were very close and when the daughter eventually ran away from home, defendant was very angry with his father.

The sister, Christine, testified that her father began sexually molesting her when she was nine and that she and defendant started using drugs at an early age to escape their father's abuse. She ran away, and eventually went into a drug and alcohol treatment facility. She testified that the father sexually abused her brother Michael and that she believes he also abused defendant. In 1982, on the recommendation of her therapist, she discussed the sexual abuse with defendant. He became "angry" and "terribly rageful." By 1982 defendant's drug abuse was getting worse.

Brother Michael testified that he had not seen defendant in years and did not keep track of or in touch with the family.

Patrick Evard, priest and family friend, described defendant as pleasant and courteous, but he detected the discord in the family unit when he visited, as he did often. The priest last saw defendant in 1983 and was then, as always, impressed with him. The priest testified that if he could have a son, he would still pick a man like defendant.

Marcia Lingge testified that in 1973, during an accident on a rafting trip, as she was attempting to rescue a drowning friend, defendant, a stranger, ran into the river and jumped into the rapids to aid in the rescue. Though their efforts were unsuccessful, she was grateful for defendant's intervention.

## V.

### PENALTY PHASE ISSUES

A. *Witherspoon/Witt.*

Defendant contends that three prospective jurors were improperly excused under *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*). The trial court excused the three jurors after expressly

finding that their doubts about the death penalty would "substantially impair" the performance of their duties as jurors. Defendant does not dispute that the standard under *Witt* is whether a juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424.) As defendant interprets *Witt*, however, a prospective juror's opposition to or doubts about the death penalty may justify removal if, but only if, those views would prevent or substantially impair the juror from *even considering* a vote for a death sentence *no matter what the evidence.* This restrictive interpretation was recently rejected in *People* v. *Ashmus* (1991) 54 Cal.3d 932, 963 [2 Cal.Rptr.2d 112, 820 P.2d 214].

In our view, defendant's interpretation eliminates the modification of *Witherspoon* (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) by *Witt* and, for all intents and purposes, reinstates the requirement that a juror's bias be proved with "unmistakable clarity." As we stated in *People* v. *Mattson* (1990) 50 Cal.3d 826, 844 [268 Cal.Rptr. 802, 789 P.2d 983], "the prospective juror's unwillingness to consider imposition of the death penalty need not appear with 'absolute clarity.' It is enough that following voir dire of the jury 'the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.' (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 426.)"

We adopted the modified standard in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767-769 [239 Cal.Rptr. 82, 739 P.2d 1250], and have applied it in subsequent automatic appeals. (See *People* v. *Ruiz* (1988) 44 Cal.3d 589, 618 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1223 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1165 [259 Cal.Rptr. 701, 774 P.2d 730]; *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1261-1262 [270 Cal.Rptr. 451, 792 P.2d 251].) In each case we have performed the task, as directed by the high court in *Darden* v. *Wainwright* (1986) 477 U.S. 168, 175 [91 L.Ed.2d 144, 153-154, 106 S.Ct. 2464], of examining the context surrounding the juror's exclusion to determine whether the trial court's decision that the juror's beliefs would "substantially impair the performance of his duties as a juror" is fairly supported by the record. (*People* v. *Ghent, supra,* 43 Cal.3d at p. 768; *People* v. *Cooper, supra,* 53 Cal.3d at p. 809.)

Our review of this record discloses support for the court's determination that the three prospective jurors had views that would substantially impair the performance of their duties as jurors. ▇▇▇ "[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of

mind is binding on an appellate court." (*People* v. *Ghent, supra,* 43 Cal.3d at p. 768.) ▆▆▆ The three prospective jurors gave answers which were arguably equivocal but which clearly support the trial court's findings of substantial impairment.[8]

## B. *Discovery.*

Pursuant to section 190.3, the prosecutor filed a notice of proposed "other crimes" evidence in aggravation which included, inter alia, the facts, circumstances, and felony conviction of a battery on a peace officer that occurred in April of 1975. Defendant filed a *Pitchess* (*Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]) motion for discovery of the names, addresses and telephone numbers of complainants against Officers LaBranch and Souza of the Sacramento Police Department, the victims of the battery. (Evid. Code, §§ 1043-1045.)[9] Defendant hoped to show that the officers had been the aggressors in the incident and had used excessive force. Defense counsel argued that he intended to present evidence at the penalty phase that defendant was not guilty of the battery, that the officers acted illegally, and that defendant reacted reasonably.

Interpreting the "pending litigation" language of subdivision (b) of Evidence Code section 1043 as referring to the pending capital charges, defendant initially sought records for the period five years prior to the murder, i.e., from 1979 to 1984. The city attorney, who appeared in opposition to the motion, argued that the only relevant time period for discovery was the April

---

[8]Thus, Juror Gehrke stated that she was against the death penalty and did not think murder would justify taking a life. Asked if she would be able to vote for the death penalty, she responded, "No, I don't think I could." Juror Grieve stated that he felt "strongly" about the death penalty: "I think it is morally wrong for society to execute someone regardless of the situation." Asked if there was any possibility, "if you felt it was appropriate, all the doubt has been removed and the case were egregious enough that you could envision yourself voting for the death penalty?" Grieve responded, "I don't think there is any way I could." Juror Miller stated that she did not know if she could sit on the case, "I wouldn't want to commit anybody to the death chamber. I couldn't have that on my conscience." When asked if she could vote for the death penalty in any case, she responded, "I don't think I could." Pushed by defense counsel to consider an extreme case, she again stated that she did not think she could consider voting for the death penalty.

[9]Evidence Code section 1043, subdivision (b), provides that a discovery motion shall include "(3) Affidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the *subject matter involved in the pending litigation* and stating upon reasonable belief that the governmental agency identified has the records or information from the records." (Italics added.)

Evidence Code section 1045, subdivision (b), provides that in determining relevance, the court shall exclude from disclosure "(1) Information consisting of complaints concerning conduct occurring more than five years before the *event or transaction* which is the *subject of the litigation in aid of which discovery or disclosure is sought.* . . . (3) Facts sought to be disclosed which are so remote as to make disclosure of little or no practical benefit." (Italics added.)

1975 date of the incident, i.e., the battery, and the five years preceding that date. The city attorney conceded that a "prima facie case" had been made as to that period, and the trial court found a "prima facie" showing as to records prior to 1975 and up to the time of the battery conviction, September 1975. Later, in accord with the provisions of Evidence Code section 1045, the court conducted an in camera inspection of records for the 1970-1975 period and found that "none of the information . . . is relevant to the subject matter involved in this litigation." Defendant is not objecting to the court's ruling as to the 1970-1975 period, i.e., its ruling of irrelevance after the in camera hearing. As will appear, defendant complains only that the trial court erred in ruling that he had not made a prima facie showing as to relevance of information concerning the officers for the *period after the defendant's conviction on the battery charge*, i.e., from September 1975 to 1984.

Following the court's denial of the discovery motion and prior to the penalty phase, defendant moved to exclude evidence of the facts and circumstances of each of the three prior "other crimes," including the battery of the peace officers. Defendant stated that he intended to admit the fact of conviction and wanted to avoid relitigating the offenses. The motion was denied. Defendant then offered to admit as true the descriptions of the three offenses from the respective probation reports. A stipulation was entered into, personally agreed to by defendant, whereby the counsel agreed to a stipulated statement of facts to be presented to the jury. (See *ante*, p. 307.)

▮▮▮ Defendant contends on appeal that the trial court committed prejudicial error in denying discovery of any citizen complaints against the two officers for the period after the 1975 conviction.[10] Defendant relies primarily on *People* v. *Memro* (1985) 38 Cal.3d 658 [214 Cal.Rptr. 832, 700 P.2d 446]. As will appear, *Memro* is not apposite.

▮▮▮ A motion for discovery of peace officer personnel records is "addressed solely to the sound discretion of the trial court." (*Pitchess* v. *Superior Court, supra*, 11 Cal.3d 531, 535.) After our decision in *Pitchess*, the Legislature in 1978 enacted Evidence Code sections 1043 and 1045 to place specific limitations and procedural safeguards on the disclosure of peace

---

[10]We note that the applicability of discovery principles (Evid. Code, §§ 1043-1045) to evidence introduced pursuant to section 190.3 (factors (b) [other violent acts] or (c) [prior convictions]) is a matter of first impression. The Attorney General does not rule out the applicability of general principles of discovery regarding "other crimes" evidence, and we see no reason to dispute their applicability to the penalty phase of a capital case so long as the relitigation of the "other crime"—here, the battery on a peace officer—is circumscribed by the bounds of relevance and admissibility of evidence that prevails in the original prosecution. In permitting discovery but limiting it to records for the period before defendant's conviction in 1975, the trial court has not overstepped the bounds of relevance and admissibility.

officer personnel files. The legislation was intended to balance the need of criminal defendants to relevant information and the legitimate concerns for confidentiality of police personnel records.

 The trial court, following argument, applied the criteria set out in the statutory scheme and ruled, as it had the discretion to do, that records of complaints after 1975 were not material or relevant to the subject matter involved in the battery prosecution. (See Evid. Code, §§ 1043, subd. (b)(3) & 1045, subd. (a).) The statutory provisions provide no authority for use, in criminal trials, of evidence of character based on specific instances of conduct that occurred *after* the prosecution of the defendant for the crime at issue. We conclude, therefore, that the trial court did not abuse its discretion in denying discovery, and we disagree with defendant that *Memro* (*supra*, 38 Cal.3d 658) compels a different result.

In *Memro* a capital defendant sought to establish coercion of his confession. His request for discovery of information regarding complaints against South Gate police officers was summarily denied by the trial court. We held that defendant had demonstrated good cause for the requested discovery and that the trial court had abused its discretion in denying the motion. For guidance on retrial we noted the statutory five-year limitation on discovery, but we added: "However, complaints regarding conduct which occurred after the interrogation in this case may be relevant to coercion." (38 Cal.3d at p. 687.)

When *Memro* was called to the attention of the trial court, it expanded its ruling, entitling defendant to seek discovery of complaints for the period beyond the battery incident and up to September 1975, the date of conviction. *Memro* requires no more. In summary, we find no abuse of discretion in the court's ruling on the discovery motion.

## C. *Prosecutorial Misconduct.*

 Defendant claims that, during the closing argument at the penalty phase, the prosecutor improperly commented on defendant's lack of remorse. The prosecutor stated: "After he killed Connie Decker, you saw at no time under any circumstance through any witness, any expression by the defendant of remorse for what he did, a human feeling for what he did." Defendant objected and moved for a mistrial. The trial court denied the motion, stating that the statement was a fair comment on the evidence and did not constitute improper comment on defendant's failure to testify.

Defendant first argues that the comment told the jury to treat lack of remorse as an aggravating factor, and he then faults the prosecution for

failing to give pretrial notice (§ 190.3, 4th par.) that he intended to rely on absence of remorse as an aggravating factor. The fourth paragraph of section 190.3 provides that "no *evidence* may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time . . . prior to trial." (Italics added.) It is axiomatic that argument is not evidence.

Nor can the comment be interpreted as a reference to defendant's failure to testify. It was simply a reference to defendant's callous behavior after the killing. The comment was interspersed in references to the circumstances and nature of the crime and to defendant's activities after the killing. Just prior to the comment to which defense counsel objected, the prosecutor had argued as follows: "As he took Connie Decker around Sacramento, he displayed for you a degree of callousness, a baseness that I hope you never see again. What do you think, honestly, now? You know, what do you think about the mitigating circumstances of the defendant? Specifically, what do you think about sympathy for someone who commits those crimes, who commits things like that, who kills without any justification for it? . . . It's simply the way he did his crimes. In 1984, the defendant killed someone without any regard whatsoever for—for her constitutional rights. There were no rules of evidence. There was no weighing of factors back and forth. The defendant was the witness, the judge, the jury and the executioner all in one for Connie Decker, without any regard whatsoever for anyone else but himself." Then followed the statement on lack of remorse, after which the prosecutor noted that the callousness and disregard for others continued after the killing.[11]

It is well settled that, in the absence of a clear reference to a defendant's failure to testify, a prosecutor is free to make a logical comment on the defendant's lack of remorse. (*People* v. *Jackson, supra,* 49 Cal.3d 1170, 1205; *People* v. *Carrera* (1989) 49 Cal.3d 291, 339 [261 Cal.Rptr. 348, 777 P.2d 121]; *People* v. *Walker* (1988) 47 Cal.3d 605, 649-650 [253 Cal.Rptr. 863, 765 P.2d 70]; *People* v. *McLain* (1988) 46 Cal.3d 97, 111-112 [249 Cal.Rptr. 630, 757 P.2d 569]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 112 [241 Cal.Rptr. 594, 744 P.2d 1127].)

By supplemental brief defendant also argues that the prosecutor's comments on the lack of remorse were untrue, that in the hospital, just prior to

[11]"All you have through all of the various witnesses who testified, who had contact with the defendant after the crimes, and all of the evidence, simply shows that the defendant, after killing Connie Decker, simply went through her things to get out of her things, out of her purse and out of her car, whatever he possibly could that would help him, that would make money for him that he could sell or that he could use. That's all. That's all you have."

arraignment, defendant stated to an attending sheriff's deputy that he was "real sorry about the girl, that she died, and her parents too." Whatever the meaning of defendant's statement, it is not part of the record and thus is not properly before us on appeal. (*People* v. *Carrera, supra,* 49 Cal.3d 291, 317.)[12] In any event, as noted above, the prosecutor's comment was clearly limited to the evidence presented at trial. The prosecutor did not state that defendant had never made an expression of remorse in any form to anyone. As he stated at the argument on the motion for mistrial, "I was discussing with the jurors the evidence in the case and the evidence with regard to the various witnesses that had contact with the defendant right after the crime." Also noteworthy is that, although defense counsel alluded to the alleged "untruthfulness" of the prosecutor's comment, he made it clear to the trial court that the *bases* for his mistrial motion were only two: "one being Griffin error and the other being it's not a proper factor to argue in aggravation."

### D. *Instructions.*

#### 1. *Unanimity on Mitigating Evidence.*

The trial court rejected a proposed instruction—i.e., that unanimity was not a requisite to consideration of mitigating evidence—on grounds the instruction was confusing and adequately covered in other instructions.[13]

It is settled that a *requirement* of unanimity improperly limits consideration of mitigating evidence. (*McKoy* v. *North Carolina* (1990) 494 U.S. 433 [108 L.Ed.2d 369, 110 S.Ct. 1227].) In *Mills* v. *Maryland* (1988) 486 U.S. 367 [100 L.Ed.2d 384, 108 S.Ct. 1860], the high court had reached the same conclusion and reversed a judgment in a capital case in which jury instructions, implemented by a verdict form, were ambiguous with regard to the need for unanimity. At sentencing, after finding the statutory aggravating circumstance that permits the imposition of death, the jury is provided a verdict form listing the mitigating circumstances. The jury in *Mills* marked "no" beside each mitigating circumstance, thereby requiring imposition of the death penalty. Under the state statute, only if the jury finds any mitigating circumstances does it proceed to decide whether the mitigating circumstance outweighs the aggravating circumstances. The high court concluded that "there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from

---

[12]A petition for habeas corpus raising the issue was submitted and rejected by this court.

[13]The proposed instruction read: "An individual juror may consider something as a mitigating factor if any reasonable evidence supports the existence of this mitigating factor and regardless of whether all twelve jurors find the existence of reasonable evidence of this mitigating factor."

considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." (*Id.* at p. 384.)

In the case before us, there is no indication that the jury was misled in any respect. There was nothing in the instructions to limit the consideration of mitigating evidence and nothing to suggest that any particular number of jurors was required to find a mitigating circumstance. The only requirement of unanimity was for the verdict itself. (CALJIC No. 8.84.2 [1986 rev.].)

The instructions that were given in this case unmistakably told the jury that each member must *individually* decide each question involved in the penalty decision. They were told to consider *all* the evidence, specifically including any circumstance in mitigation offered by defendant. We find no error in the court's refusal to give defendant's proposed instruction.

Defendant's reliance on *People* v. *Jennings* (1988) 46 Cal.3d 963 [251 Cal.Rptr. 278, 760 P.2d 475] is misplaced. We merely held in *Jennings* that the trial court *did not err* in giving the prosecutor's requested instruction that the jurors did not have to be unanimous regarding the presence of aggravating factors.

## 2. *Standard for Imposition of Death.*

Defendant finds fault with the following portion of the instructions to the jury: "To return a judgment of death, each of you must be persuaded that the aggravating factors are so substantial in comparison with the mitigating factors that it warrants death instead of life in prison without parole." (See CALJIC No. 8.84.2.) Defendant complains that the words "so substantial" are vague, directionless, and impossible to quantify; also, the word "warrants" is synonymous with "authorized" and directs the jury's attention away from the crucial question, i.e., whether the death sentence is "appropriate."

A similar objection to the phrase "substantial" was made and rejected in *People* v. *Sully, supra,* 53 Cal.3d 1195. We concluded that the charge to the jury, considered as a whole, adequately conveyed to the jury the seriousness of its task and the legally appropriate manner of performing it. We stated, quoting from *People* v. *Brown* (1985) 40 Cal.3d 512, 541-542, footnote 13 [220 Cal.Rptr. 637, 709 P.2d 440], " '[T]he balance is not between good and bad but between life and death. Therefore, to return a death judgment, the jury must be persuaded that the "bad" evidence is so substantial in comparison with the "good" that it warrants death [rather than] life without parole.' " (*People* v. *Sully, supra,* 53 Cal.3d at p. 1244.)

The language complained of is part of the standard instructions and was added in the 1986 revision of CALJIC No. 8.84.2 to provide the jury with greater discretion to impose life in prison and limited the circumstances under which the jury could impose death. The language follows instructions that provide: "The weighing of aggravating and mitigating factors does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances factors you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of aggravating factors with the totality of the mitigating factors." Essentially, the jury was told that it could return a death verdict only if aggravating circumstances predominated and death is the appropriate verdict.[14]

The foregoing discussion also disposes of defendant's claim that the jury was not told to find that death was the appropriate penalty. It is argued that the jury was told merely to find death "warranted," a considerably broader concept that "appropriate." The contention is spurious.

### 3. Single Mitigating Factor Can Justify Life.

■ Defendant assigns error to the trial court's refusal to instruct that a single mitigating factor, standing alone, may support a decision that death is not the appropriate punishment. Actually, defendant had proposed and the court had rejected a much longer instruction which read: "The possible mitigating factors which I previously read to you are merely examples of what you may take into account in selecting life in prison without possibility of parole for David Anthony Breaux. Thus, you may consider any fact or rationale before you as mitigating. Each mitigating factor is important because any single mitigating factor may, standing alone, support a decision that death is not the appropriate punishment for Mr. Breaux." The trial court refused the instruction as confusing and superfluous.

Even if the proposed instruction were not burdened with surplusage, however, failure to instruct that a single mitigating factor may support a nondeath verdict would not compel reversal. (*People* v. *Williams* (1988) 45

---

[14]In support of his contention that the term "substantial" is unconstitutionally vague, defendant cites a Georgia capital case in which the word "substantial" was used as part of an aggravating circumstance, i.e., whether the murder is committed by a person who has a "substantial history of serious assaultive criminal convictions." The Georgia court found the word "highly subjective" and the aggravating circumstance unconstitutionally vague. (*Arnold* v. *State* (1976) 236 Ga. 534 [224 S.E.2d 386].) The differences between the Georgia case and this case are obvious.

Cal.3d 1268, 1322 [248 Cal.Rptr. 834, 756 P.2d 221].) Defendant's reliance on *People* v. *Grant, supra,* 45 Cal.3d 829, is misplaced. In *Grant,* the jury had been given the "unadorned" *Brown* instruction and, as directed in *Brown* (*People* v. *Brown, supra,* 40 Cal.3d 512, revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), we sought to determine whether the jury may have been misled to the defendant's prejudice. (40 Cal.3d at p. 544, fn. 17.) We concluded that it had not been misled and, in passing, we also concluded that the jury had not been misled by the failure to give a requested instruction that the jury was to weigh, not merely to count the factors, that the weighing of factors was an individual decision, and (incidentally) that a single mitigating factor was sufficient to support a decision against death. We added that, after *Brown,* "such an instruction has been proper." (*People* v. *Grant, supra,* 45 Cal.3d at p. 857, fn. 5.)

In the instant case, the potentially misleading *Brown* instruction *was not given.* The instructions that were given have been found adequate to perform the constitutional function of guiding the jury's discretion in sentencing. (See *People* v. *Sully, supra,* 53 Cal.3d 1195, 1243-1244; *People* v. *Duncan* (1991) 53 Cal.3d 955, 977-979 [281 Cal.Rptr. 273, 810 P.2d 131].)

E. *Coercion of Jury.*

 Defendant contends that the trial court placed undue pressure upon the jury to return the death verdict and that the coercion of the jury violated his right to due process and a fair trial under the Sixth, Eighth and Fourteenth Amendments to the federal Constitution and sections 15 and 16 of article I of the state Constitution.

The jury retired for its penalty deliberations at 2:35 p.m. on December 29, 1986, and deliberated until 4:20 p.m. On the afternoon of the following day, the jury requested the rereading of the testimony of defendant's mother and sister. The court recessed the jury early in order to deal with the problem of the illness of one of the court reporters. The matter was resolved and on the morning of December 31 the requested testimony was reread to the jury. Deliberations continued through the afternoon of December 31. The jury reconvened on the morning of January 5, 1987, at which time the jury sent to the court the following note: "Jury having taken several polls and discussed all facts and evidence before us, is not able to come to a unanimous decision." In the courtroom, the foreperson was asked if with further deliberation there was a chance for a decision; she responded in the affirmative. Three other jurors were polled; two stated that differences might be resolved with further deliberations. The court asked the jury to resume deliberations.

At 1:45 p.m. the jury sent another note: "The jury is not able to reach a unanimous decision." Before calling the jury, the court stated its intentions to the parties: "I intend to find out how much they've deliberated. . . . If it looks like there's been a change and I ask the jurors if it appears they think there's a chance, I'll send them back again. I don't like to ask for the division until just before I make a final decision as a last—as a last ditch effort to see where they stand. And then if they're close, I'll send them back. . . . And—however, if it does look like they are split rather decidedly and if there's been no change in the last few ballots and they have deliberated and no one thinks that they can do anything more, even though they were only out for a day and a half, I will then have to consider whether or not to declare a mistrial."

When the jury was brought into court, the foreperson stated that one additional ballot had been taken and there had been no change in the voting. The foreperson expressed the opinion that she did not think there was anything the court could do to aid in reaching a verdict. When polled on the chances of reaching a verdict, the jurors were pessimistic—one said the chances were "extremely slight," several stated that they did not "believe so" or it did not appear there was a reasonable chance, and the remainder responded negatively. The court inquired and was given the numerical breakdown—10 to 2.

After a brief pause in the proceedings, the court indicated that it would ask the jury to deliberate for an additional short period of time and, after the jury had retired, the court told counsel that it intended to call the jury back in approximately an hour's time: "I know they said they made no movement, but when you get a case of this length to have them deliberate for a relatively short period of time in a case like this,[15] I feel that I look to them and to the court system to try a little longer."

Before the hour was up, the jury asked for a rereading of the testimony of three guilt phase witnesses, Greg Hardy (victim of the robbery and kidnap) and two police officers (Tatosian and Reed). The testimony of Greg Hardy was reread at that time and that of the officers was reread on the morning of January 6. The jury reached its verdict on the afternoon of that day.

Section 1140 provides: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties,

---

[15]From the record, we estimate that the jury deliberated for approximately eight hours total in the period from the commencement of deliberation on December 29, 1986, to the second impasse on January 5, 1987.

entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

The determination whether there is reasonable probability of agreement rests in the discretion of the trial court. (*People* v. *Miller* (1990) 50 Cal.3d 954, 993 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People* v. *Sheldon* (1989) 48 Cal.3d 935, 959 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 775 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Rojas* (1975) 15 Cal.3d 540, 546 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127]; *People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353].) The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." (*People* v. *Carter, supra,* 68 Cal.2d at p. 817.) While the question of coercion is necessarily dependent on the facts and circumstances of each case, we do not agree with defendant that the circumstances he cites as controlling establish that the trial court abused its discretion in this case.

Defendant stresses that the deadlock occurred during the penalty, not the guilt, phase of the trial, and that the trial court asked for resumption of deliberations *after inquiry* into the numerical division of the jury, a practice which we have never approved in the penalty phase of a capital case. Not so. The practice of inquiring into the jury's numerical division was expressly approved in *People* v. *Carter, supra,* 68 Cal.2d 810, and, despite a contrary rule of procedure in federal courts,[16] has been expressly approved in *People* v. *Rodriguez, supra,* 42 Cal.3d at page 776, footnote 14. Any question that a different rule might apply at a penalty phase impasse was resolved by our decision in *People* v. *Sheldon, supra,* 48 Cal.3d at pages 958-960, where we rejected defendant's claim that it was "inherently coercive" to ask for a resumption of deliberations after learning of the jury's 11-1 vote in favor of death. In assessing the *effect* of the information on the trial court's handling of the jury impasse, it is not significant that, in *Sheldon,* the jury volunteered the information on numerical division before the court could request it.

Defendant states that the jury deliberated for four days before announcing an impasse. He emphasizes that the jury was asked to resume deliberations not once but twice and that the second followed a polling of the jurors, all of whom were negative on the prospects of a verdict.

---

[16](*Brasfield* v. *United States* (1926) 272 U.S. 448 [71 L.Ed. 345, 47 S.Ct. 135]; *Lowenfeld* v. *Phelps* (1988) 484 U.S. 231, 239-240 [98 L.Ed.2d 568, 578-579, 108 S.Ct. 546] [federal rule based solely on the high court's supervisory powers over the federal courts and not on constitutional provision].)

In *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 775-776, we rejected a claim of coercion where a jury was asked to resume deliberations after 18 days of deliberation, with 4 intermittent impasses. Whether we accept defendant's four days or the trial court's "day-and-a-half" as the measure of the length of deliberation time, we agree with the trial court that the jury had deliberated for a relatively short period of time in relation to the complexity of the charges and the nature of the evidence that was presented at both phases of the trial.

Nothing in the record suggests that the jury was coerced in any way. The judge made no threats, no statements that could be interpreted as exerting undue pressure on any juror. The judge was principally concerned that the jury had not deliberated for a sufficient time relative to the complexity of the case. He did not indicate that a verdict had to be reached and reminded the jurors of their right to an individual opinion. The judge did not threaten to prolong the deliberations; on the contrary, he indicated that he would call them back in approximately an hour. The court did not abuse the discretion vested in it by section 1140 to determine the reasonable probability of reaching a verdict.

### F. *Victim Impact Evidence.*

The probation report contained a statement by the murder victim's mother. The statement was submitted pursuant to section 1191.1. The trial court denied a defense motion to strike the statement as inconsistent with the trial court's responsibilities under section 190.4, subdivision (e), the automatic motion for modification of verdict. The court found no contradiction or conflict between section 1191.1 and section 190.4, subdivision (e): "I can comply completely with both sections without conflict." The trial court indicated that, in ruling on the modification motion, it would take into consideration only the items set forth in subdivision (e) of section 190.4; in imposing sentence, under section 1191.1, it would consider the statements of the victim's mother if she wished to speak. The mother then made a short statement in open court.

 Defendant contends that the trial court considered improper victim impact evidence under *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] when, on the motion for modification, it read the probation report and heard the mother's in-court statement. We reject the contention for a number of reasons.

*Booth* v. *Maryland, supra,* 482 U.S. 496, has been overruled by the high court (*Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct.

2597]), but even before *Payne,* we have consistently held that the holding in *Booth* did not extend to proceedings relating to the application for modification of the verdict under section 190.4, subdivision (e). (See *People v. Duncan, supra,* 53 Cal.3d 955, 981; *People v. Benson* (1990) 52 Cal.3d 754, 812 [276 Cal.Rptr. 827, 802 P.2d 330]; *People v. Jennings, supra,* 46 Cal.3d 963, 994.)

Insofar as defendant's claim of error is based on the statutory provisions (i.e., § 190.4, subd. (e)) that require the trial court to consider only the evidence that was before the jury, we find no judicial misconduct. In addition to its stated intention to consider the evidence only as statutorily prescribed, the trial court's statement of reasons for denying the motion clearly indicate that the court relied for its decision only on the evidence presented at trial. (See *People v. Williams, supra,* 45 Cal.3d 1268, 1329.)

G. *Defects in Capital Sentencing Process.*

Defendant lists eight alleged statutory, procedural, and substantive defects in the capital sentencing process. He recognizes that each claim of an alleged defect has been considered and rejected by us in recent past decisions. We have found no constitutional violation in the following:

1. The use of peremptory challenge to exclude potential jurors who express reservations about the death penalty. (*People v. Gordon, supra,* 50 Cal.3d at p. 1263; *People v. Turner* (1984) 37 Cal.3d 302, 313-315 [208 Cal.Rptr. 196, 690 P.2d 669].)

2. The failure to find that death is the appropriate sentence beyond a reasonable doubt. (*People v. Rodriguez, supra,* 42 Cal.3d 730, 777-779; see also *People v. Duncan, supra,* 53 Cal.3d at p. 979; *People v. Allen* (1986) 42 Cal.3d 1222, 1285 [232 Cal.Rptr. 849, 729 P.2d 115.)

3. The failure to find that aggravating factors were true beyond a reasonable doubt. (*People v. Rodriguez, supra,* 42 Cal.3d 730, 777-779; see also *People v. Duncan, supra,* 53 Cal.3d at p. 979; *People v. Allen, supra,* 42 Cal.3d 1222, 1285 [232 Cal.Rptr. 849, 729 P.2d 115].)

4. The failure to require procedural safeguards (i.e., written findings on aggravating factors, jury unanimity on aggravating factors, a finding that aggravating factors outweigh mitigating factors beyond a reasonable doubt). (See *People v. Frierson* (1979) 25 Cal.3d 142, 172-188 [158 Cal.Rptr. 281, 599 P.2d 587].)

5. The use of facts underlying previous felony convictions as aggravating factors. (See *People v. Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301].)

6. The failure to clarify that "other crimes" aggravating factors did not apply to guilt phase crimes. (See *People* v. *Bonin* (1988) 46 Cal.3d 659, 703 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People* v. *Miranda, supra,* 44 Cal.3d 57, 105-106.)

7. The failure to require unanimity in the finding of prior criminal activity. (See *People* v. *Jennings, supra,* 46 Cal.3d 963, 987-988.)

8. The multiple use of a felony count to qualify for felony murder, to support a special circumstance finding, and as an aggravating factor. (See *People* v. *Gates, supra,* 43 Cal.3d 1168, 1208; *People* v. *Adcox* (1988) 47 Cal.3d 207, 272 [253 Cal.Rptr. 55, 763 P.2d 906].)

CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.**—I concur in the judgment. After review, I have found no error warranting reversal.

I write separately to address a single issue of substantial importance.

Peace officer records are generally discoverable, provided that the information they contain is "relevant." (Evid. Code, § 1045, subd. (a).) The adjective is defined as "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.,* § 210.) It is manifest that information may be relevant, whether it relates to an incident that precedes *or* succeeds the event subject to litigation.

By way of illustration: O arrests A for battering a police officer; he arrests B the next day for the same offense; and he arrests C the day following, again for the same offense. In the ensuing prosecution, B intends to rely on self-defense. Information about O's arrest of A has a strong tendency to prove directly whether O used excessive force in that incident. It also has at least some tendency to prove circumstantially—through habit or custom— whether O used excessive force against B the following day. Similarly, information about O's arrest of C has a strong tendency to prove directly whether he used excessive force in that incident. It also has at least some tendency to prove circumstantially—through habit or custom—whether O used excessive force against B the day earlier.

The majority imply, correctly, that a trial court may order discovery of peace officer records relating to incidents that succeed the event in question.

But they also imply, incorrectly, that it may do so only if the incidents precede any conviction the event may yield. In support of this qualification, they cite Evidence Code sections 1043 and 1045. But to no avail. True, the statutory provisions bar disclosure of various categories of information. But clearly, they do not purport to affect information on incidents that succeed the event. And more clearly still, they do not purport to draw any line at the time of conviction therefor.

In conclusion, because I have found no error warranting reversal, I concur in the judgment.

Kennard, J., concurred.

Appellant's petition for a rehearing was denied February 26, 1992.