Filed 7/3/13  P. v. Bunn CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054196 |
| v. | (Super.Ct.No. SWF026553) |
| MARY ALLISON BUNN et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Ronald L. Johnson, Judge.  (Retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant Mary Allison Bunn.

Babak Semnar, under appointment by the Court of Appeal, for Defendant and Appellant William Steven Bunn.

1

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant William Steven Bunn of cultivating marijuana (Count I—Health and Saf. Code, § 11358); the lesser included misdemeanor offense of child endangerment[1] (Count II—Pen. Code, § 273a, subd. (b));[2] and possession of a firearm by a person prohibited to do so (Count III—Pen. Code, § 12021, subd. (c)(1)).  The same jury convicted defendant and appellant Mary Allison Bunn of cultivating marijuana, (Count I—Health and Saf. Code, § 11358) and the lesser included misdemeanor offense of child endangerment (Count II—Pen. Code, § 273a, subd. (b)).[3] The trial court sentenced William to a 16-month aggregate term of imprisonment.  It granted Mary probation.

On appeal, Mary contends:  (1) the trial court erred by declining to quash the search warrant and exclude all evidence discovered pursuant thereto; (2) the trial court erred in refusing to instruct on possession of marijuana as a lesser included offense of cultivation; and (3) that substantial evidence does not support her conviction for misdemeanor child endangerment.  William maintains the People committed several acts

---

[1] The jury found both defendants not guilty of the charged offense of felony child endangerment.  (Pen. Code, § 273a, subd. (a).)

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] We use defendants' first names for the sake of clarity, due to the fact that they share the same last name.  No disrespect is intended.

of prejudicial misconduct depriving him of his constitutional right to a fair trial. Defendants join in each others' claims. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

Special Agent Eric Ball of the Drug Enforcement Administration (DEA) received information regarding the indoor cultivation of marijuana at a residence on Lilac Road in San Diego County (hereinafter "Lilac Road"); he started conducting surveillance of the home. On July 31, 2008, he noticed "a heap of debris including . . . ventilation ducting, empty grow light boxes, and the type of debris that [he] would expect to see from a marijuana-cultivation operation."

On August 1, 2008, Ball again conducted surveillance of Lilac Road. He followed two vehicles that left the home. One was registered to a Dean Childers and the other to a Christopher Yap. The vehicles led him to Loring Road in Murrieta; however, Ball had to terminate his surveillance when the road turned from asphalt to dirt, because he feared his surveillance would be discovered in such a remote location.

Ball returned to Lilac Road in order to obtain a closer look at the home. He walked up to the front door where he observed the "strong odor of marijuana, sounds of lights and ballasts humming within the residence. [He] could see the bright grow lights through a seam in the window where a plastic tarp had been hung in the window but enough seam where the bright light was shining through." Such circumstances were consistent in Ball's experience with marijuana cultivation.

On August 20, 2008, Ball again conducted surveillance of Lilac Road. He again observed Childers's vehicle, which he followed as Childers left the home. Childers led

3

him toward the same area in Murrieta to which he had previously been led, but to a specific residence on Catt Road (hereinafter "Catt Road"). Ball surveilled the home with binoculars. He observed Childers exit his vehicle and enter a detached garage on the property.

On August 21, 2008, Ball again conducted surveillance of Catt Road. He observed three vehicles on the property. One was registered to defendants, one to Childers, and the remaining to Yap. Ball saw William, Childers, and Yap exit the detached garage. It appeared the three men were working together; they went to Yap's car where they retrieved a box.

Ball witnessed Mary exit the residence with a child; the child was walking around the driveway as Mary followed him. He never saw Mary enter the garage. Yap departed from the residence first and Childers left thereafter. William picked up the child and went back into the house.

Childers had previously been arrested for cultivation of marijuana. Ball noted Childers had left a location suspected of being an active site for marijuana cultivation (Lilac Road) to another address (Catt Road), where his focus was on the detached garage.

In August 2008, Detective Richard Holder of the Riverside County Sheriff's Department was assigned to the Southwest Corridor Narcotics Task Force, which consisted of a group of local law enforcement officers who enforced drug laws within southwest Riverside County. Holder conducted a separate surveillance of Catt Road on August 26, 2008. Ball conveyed his observations to Holder; Holder drafted an affidavit and declaration in support of a search warrant for Catt Road. Warrants were obtained for

4

both Lilac Road and Catt Road; they were executed at the same time so the occupants of one residence could not notify those in the other. Ball participated in the search of Lilac Road.

On August 27, 2008, Holder participated in a search of Catt Road, defendants' home. Presearch and postsearch videos of the location were recorded and played for the jury. In the detached garage, officers found a "grow-room" in which 79 live marijuana plants approximately one and a half to two feet in height, some of which were budding, were found; the door to the grow-room was unlocked.

The grow-room had an electrical bypass, allowing the use of electricity directly from the grid, bypassing that supplied to the residence; Holder testified this is a technique typically used to hide illegal marijuana cultivation because the high amount of electricity required does not then show on the residents' electrical bills. Holder observed a child's wooden horse toy, a rocking horse, and stroller in the garage adjacent to the grow-room.

Inside the home, officers found a small, usable quantity of marijuana on a desk attached to the kitchen area. On the ledge of a window, they found a small, glass smoking pipe with burnt marijuana residue inside. On the kitchen countertop, they found a clear plastic baggie with marijuana inside. They also found another bag with over 50 tablets on the countertop.[4] Holder recalled seeing a baby gate between the living room

---

[4] Criminalist Javed Kahn of the Department of Justice testified the bag contained 78 prescription 60-milligram codeine tablets.

5

and kitchen lying on the floor.[5]  He saw the child go into the kitchen while he was there. Holder testified all the drugs were within reach of defendants' then 22-month-old child.

On the nightstand in the master bedroom, officers found a lighter, a digital scale, loose marijuana, and an ashtray.  They also found a number of "High Times" magazines which are typically found amongst people who use, grow, and sell marijuana.  "[T]he home was unkempt.  There were items strewn about in literally every room of the house."

Officers found a 12-gauge, pump-action shotgun and 13 live rounds of ammunition on the shelf in the closet of the master bedroom.  They also found a semiautomatic .38-caliber handgun with a magazine and two or three live rounds next to it on a shelf above the refrigerator.[6]  A background check of William conducted prior to the search revealed he had a conviction for assault by force by means likely to produce great bodily injury, which prohibited him from possessing a firearm.  Based on the totality of the circumstances, Holder came to the conclusion the grow-room was part of an illegal grow operation.

William told Holder he was involved with the marijuana grow because "he needed some extra money and that times were hard."  William admitted using marijuana.  Mary indicated she frequented the garage.  Neither defendant possessed a valid medical

---

[5]  Detective Robert McRae of the Riverside County Drug Endangered Children Team testified Holder informed him the gate was secured when officers first entered the home.

[6]  Detective Rob McRae testified Holder informed him the shotgun was found on the bed in the master bedroom, and the pistol in a cabinet above the refrigerator.

marijuana card nor recommendation at the time of the search. Holder called child endangerment investigators to the scene.

Denise Moore, a forensic interviewer with the Department of Public Social Services, responded to the residence. She interviewed defendants. William told her they had the firearms to scare off coyotes. He told her he had been cultivating marijuana for at least two weeks because he needed to supplement his income. Mary said she knew nothing about the marijuana cultivation; however, Moore found that difficult to believe due to the toddler toys found in the garage. Defendants both admitted smoking marijuana. Moore observed unsecured marijuana in the home. She made the decision to place defendants' child in protective custody.

Detective McRae also responded to the scene. He observed a stroller and two rocking horses near the grow-room in the garage. McRae testified the grow-room represented a potential fire hazard and could pose a risk to the child because people would want to rob the home for marijuana and any money associated with its sale. There were also children's toys in the master bedroom; McRae was concerned that the child could ingest any of the unsecured marijuana found in the home.

After completing the search of defendants' home, Holder executed a warrant at Yap's home and determined the marijuana growing at the home was within the confines of the law; hence, Yap was not arrested. Yap testified he was the current vice president, but former president of the Human Kindness Center (HKC) for the past three years, which included August 27, 2008. He testified the HKC is "a private patient collective. We cultivate marijuana for patients . . . for various needs under [the California's

7

Compassionate Use Program]." The parties stipulated the HKC "'was a valid authorized legal collective on or about August 27 of 2008.'"

Yap testified that he first met William in the beginning or middle of August 2008. He had a discussion with William about using a portion of William's garage to grow marijuana. Yap was responsible for purchasing all the equipment. He and Childers set up the irrigation systems, lights, temperature controls, and electrical equipment. Yap intended to pay rent for the room and recompense for water and electricity; once they became members of the collective, defendants would receive some of the marijuana. Yap and Childers brought the marijuana plants into the garage one week prior to August 27, 2008. The grow-room was completely sealed from ground to ceiling and could be entered only through a door, on which there was a lock to which Yap had the only key. Yap visited the room daily to care for the plants; none of them were mature enough to contain any usable marijuana.

Yap testified he never discussed the grow-room with Mary, nor did she have anything to do with setting it up. William did not purchase any of the equipment, set any of it up, or grow the plants for him.[7] Yap acknowledged defendants did not have legal medical recommendations to grow marijuana.

---

[7] However, Yap previously signed a declaration under penalty of perjury reflecting that William was growing the marijuana for him. Yap testified the declaration was prepared by someone else and was inaccurate.

8

Mary testified she brought the handgun into the home, and her father-in-law gave her the shotgun.[8] She retained them because there were mountain lions and coyotes in the area. The codeine pills and marijuana were in a can located in the kitchen cupboard, not on the counter. There was no unsecured marijuana in the home. The baby gate was up and secure on August 27, 2008. Mary testified she was not involved in the cultivation of marijuana, but knew of its existence. The stroller and rocking horses were being stored in the garage; they were not being used by her child. There were no baby toys in the master bedroom.

## DISCUSSION

### A.    MOTION TO QUASH WARRANT

Mary contends the court erred in refusing to quash the search warrant, because Holder either deliberately or recklessly failed to disclose in his affidavit in support of the warrant the fact that Yap was operating a legal medical marijuana collective. We disagree.

Holder submitted an affidavit in support of a search warrant of Catt Road on August 22, 2008. Holder recited his experience as an investigator with the Riverside County Sheriff's Department since June 2002; as a deputy with that office since July 1990; and previously as a deputy with the Orange County Sheriff's Department. He declared he was part of a task force consisting of agents and officers from the DEA, Ontario Police Department, United States Immigration and Customs Enforcement,

---

[8] On cross-examination, Mary admitted she showed the guns to William.

9

Riverside Police Department, Riverside County Sheriff's Department, San Bernardino County Sheriff's Department, and the IRS.

Ball had received information from a reliable, confidential informant regarding an indoor hydroponic marijuana grow inside Lilac Road. Further investigation revealed the home belonged to Childers. Holder noted Childers had convictions for cultivation and possession of marijuana for sale on December 14, 2005, for which he was placed on three years' probation.

On July 31, 2008, Ball went to Lilac Road and observed discarded ventilation ducting, ducting couplings, vents, fans, and a reflective hood box piled in the driveway. Based on his training and experience he believed such objects were used as part of marijuana cultivations. On August 1, 2008, Ball walked to the garage door of Lilac Road, where he observed an amber light similar to that used by high intensity bulbs specifically used to grown indoor marijuana. He also smelled the odor of cultivated marijuana emanating from the slightly open garage window and window next to the front door. He additionally noted the sound of what he believed to be irrigation systems used in the cultivation of marijuana.

On August 20, 2008, Ball followed Childers's vehicle from Lilac Road to Catt Road. William had prior convictions on March 20, 2003, and November 5, 2005, for being under the influence of a controlled substance. Ball saw Childers exit the garage, obtain something from his vehicle, and then return to the garage.

On August 21, 2008, Holder spoke with a Southern California Edison Fraud and Revenue Protection Investigator who informed him Catt Road had several spikes in

10

electrical usage, including recent bills showing three times that of what a regular residence of its size uses. Holder opined Catt Road was being used to cultivate marijuana, and requested a warrant to search the home, garage, and vehicles. The search warrant was issued upon Holder's affidavit.

On June 18, 2009, Mary's counsel filed a motion to quash the search warrant. Mary's counsel argued Holder intentionally or recklessly omitted the fact that Yap, one of the individuals witnessed at defendants' home, was the operator of a legal medical marijuana collective, from the affidavit in support of the search warrant. Counsel attached the declaration of Yap in which he affirmed he was the President of HKC, a nonprofit medical marijuana cooperative, and that William had "agreed to build a grow house in his garage for the collective. I am informed and believe that [William] had a doctor's recommendation for medical marijuana and a valid identification card issued by the State of California for medical marijuana. I never discussed the details of the enterprise with Mary Bunn and she had absolutely nothing to do with the operation."

Yap further declared, "I was responsible for purchasing the plants and [William] was just growing them for me because he had the facilities. Mary . . . did not know anything about the operation, and I never discussed the operation with her . . . ." Yap asserted that Holder informed him Yap's operation was lawful under state law.

Without holding an evidentiary hearing, the court denied the motion reasoning "your argument today is that [Holder] should have known, I don't have specific declarations or factors in the moving papers or in the supplemental documents that prove or meet the burden of proof. [¶] Because there are no declarations that specifically

11

support the position Deputy Holder recklessly acted with disregard for the truth or made false statements or omissions on statements raised in argument and supposition by the defendant, the Court finds good cause to deny the motion to quash."

"A defendant who challenges a search warrant based on omissions in the affidavit bears the burden of showing an intentional or reckless omission of material information that, when added to the affidavit, renders it insufficient to support a finding of probable cause. [Citations.] . . . [T]he defendant must make his showing by a preponderance of the evidence, and the affidavit is presumed valid." (*People v. Scott* (2011) 52 Cal.4th 452, 484; see also *People v. Maestas* (1988) 204 Cal.App.3d 1208, 1216.) If a defendant meets her burden, then the court must determine whether the remaining content of the affidavit is sufficient to establish probable cause. If not, then "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." (*Franks v. Delaware* (1978) 438 U.S. 154, 156.) "[A] *Franks* violation cannot be excused under the . . . good faith exception to the exclusionary rule." (*United States v. Cowling* (8th Cir. 2011) 648 F.3d 690, 695, fn. 4.)

Here, Mary failed to meet her burden to establish a substantial showing of reckless or intentional omission of material facts. Mary submitted no evidence that Holder, or any of the officers with whom he was connected, knew Yap operated a legally valid medical marijuana cooperative. Mary's suggestion Holder "very likely knew about Yap's lawful operation" is pure conjecture. In fact, the only *evidence* of such knowledge on the part of Holder came during the search on Yap's residence *after* the search of defendants' residence had already been completed. Thus, Mary's assertion is completely contradicted

12

by the fact that Holder also executed a search warrant on Yap's home. The court correctly denied Mary's motion to quash the search warrant.

### B. INSTRUCTION ON POSSESSION AS A LESSER INCLUDED OFFENSE OF CULTIVATION

Mary contends the trial court erred in denying her request that it instruct the jury on possession of marijuana as a lesser included offense of marijuana. We hold the court correctly refused the instruction.

Prior to trial, Mary's counsel noted "a third affirmative defense, which is a complete defense, is no possession. Clearly, if you don't have possession, then you don't need to be a qualified patient, and you don't need to be a caregiver. Mr. Yap's testimony, as indicated in our report, will say that the marijuana that was found in [defendants'] garage was within a room that was exclusive to his control. There was a door that closed, and there was a lock that only he held the key to. [¶] Therefore, he had exclusive control of the marijuana." The prosecutor responded "[Defense counsel] is completely accurate. . . . [I]t would be a defense if believed by the jury."

After the People rested its case, but before the defense put on theirs, Mary's counsel requested the court instruct the jury on possession as a lesser included offense of cultivation: "Your Honor, I believe it's just simple possession. There was evidence in this case that there was marijuana in the master bedroom and also in the kitchen area. There was testing done, and I believe we had an expert that testified that he tested a plant-like substance that revealed it was marijuana. That's simple possession." The court denied the request.

13

"[A] trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence. [Citation.] It is error for a trial court not to instruct on a lesser included offense when the evidence raises a question whether all of the elements of the charged offense were present, and the question is substantial enough to merit consideration by the jury. [Citation.] When there is no evidence the offense committed was less than that charged, the trial court is not required to instruct on the lesser included offense. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

The obligation to instruct on lesser included offenses arises even where inconsistent with the defense's theory of the case or where specifically objected to by the defense, so long as substantial evidence supports it. (*People v. Breverman* (1998) 19 Cal.4th 142, 159.) "[E]*very* lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury." (*Id*. at p. 155.) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense. [Citation.]" (*People v. Booker*, *supra*, 51 Cal.4th at p. 181.) Simple possession of marijuana is a lesser included offense of cultivation. (See *People v. Dieck* (2009) 46 Cal.4th 934, 938; CALCRIM No. 2370.)

Here, instruction on possession as a lesser included offense was both inconsistent with the defenses' theory of the case and was not supported by substantial evidence. A lesser included offense of possession could not be based upon defendants' control of marijuana within the home, because they were not charged with any offenses for that behavior. As the court correctly pointed out, defendants were charged with cultivation

14

based on the live marijuana in the grow-room, not on any marijuana in the house.  Thus, the court correctly denied Mary's request.

### C.     SUBSTANTIAL EVIDENCE OF CHILD ENDANGERMENT

Mary argues insufficient evidence supports her conviction of misdemeanor child endangerment.  William joins her argument.  We hold substantial evidence supported defendants' convictions for child endangerment.

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]  [¶]  The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . .  [Citation.]  "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility.' [Citation.]"  (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)  "Any person who . . . willfully causes or permits [a] child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor."  (§ 273a, subd. (b); CALCRIM No. 823.)

15

Here, sufficient evidence was adduced that defendants' actions placed their child in a situation in which his health might be endangered. Although Holder testified he saw a baby gate, he said it was down when the search warrant was executed, giving the child access to the kitchen; in fact, he said he saw the child enter the kitchen while he was there. Holder testified the officers found a bag of marijuana and the codeine tablets on the kitchen counter within reach of the child. Moore observed unsecured marijuana in the home, including on the counter in the kitchen, within reach of the child. Officers also found a usable amount of marijuana on a desk attached to the kitchen area. On the ledge of a window, they found a small glass smoking pipe with burnt marijuana residue inside. On the nightstand in the master bedroom in which children's toys were seen, officers found a lighter, a digital scale, loose marijuana, and an ashtray.[9] This evidence, in and of itself if believed, was enough to support the conviction because it could have led to accidental ingestion of the drugs by the child.

---

[9] At oral argument, counsel for Mary contended MacRae repudiated his prior testimony toys were found in the master bedroom when confronted with the presearch video of the master bedroom. We disagree. MacRae's testimony on cross-examination acknowledged the presearch video apparently did not show any toys, but he also testified expressly and implicitly the video did not show every possible angle of the master bedroom. Indeed, on redirect, MacRae testified he recalled seeing "gender-age specific toys that would be related to a child such as the [defendants'] in the master bedroom." Thus, viewing the evidence "in the light most favorable to the judgment" there was substantial evidence in the record to support a jury's determination that children's toys were found in the master bedroom. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)

16

The People additionally adduced evidence a shotgun was found on the bed in the master bedroom.[10] Children's toys were located in the garage next to the grow-room. Despite Mary's testimony to the contrary, this was sufficient circumstantial evidence for the jury to determine defendants' child played in the garage. In fact, Mary indicated she frequented the garage. Holder testified the door to the grow-room was unlocked when he first encountered it. McRae testified the grow-room represented a possible fire hazard. Moreover, there was a danger the child might pick up and ingest marijuana clippings inside the grow-room. Thus, sufficient evidence was adduced below to support defendants' convictions for misdemeanor child endangerment.

D.     PROSECUTORIAL MISCONDUCT

William argues the People engaged in several acts of prejudicial prosecutorial misconduct during its closing and rebuttal arguments. We hold the People committed no acts of misconduct.

---

**10** At oral argument, counsel for both the People and Mary argued no evidence supported a finding the shotgun was found on the bed in the master bedroom. On the contrary, MacRae testified he was told the shotgun was found on the bed. When asked whether he was told it was on the bed or in the master bedroom, he replied the master bedroom. However, he again, later testified during cross-examination someone informed him the shotgun was found on the bed. Although MacRae agreed the shotgun would not have posed a danger to the child in a hypothetical posed to him on cross-examination based on a still of the presearch video in which defense counsel posited, "If I were to tell you that is the shotgun and location it was found," he did not repudiate his prior testimony that he was told the shotgun was found on the bed. Thus, viewing the evidence "in the light most favorable to the judgment," there was substantial evidence in the record to support a jury's determination that the shotgun was found on the bed in the master bedroom. (*People v. Livingston*, *supra*, 53 Cal.4th at p. 1170.)

Misconduct by the prosecutor violates the federal Constitution when it "'"'comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'"'"' (*People v. Hill* (1998) 17 Cal.4th 800, 819.) "'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"' [Citation.]' [Citation.]" (*Ibid.*) We review de novo a defendant's claim of prosecutorial misconduct. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860.)

"'"'[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom.'" [Citation.]' [Citation.] When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. [Citation.]' [Citation.] 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' [Citation.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1403.)

1.     *ALLEGED DISPARAGEMENT OF DEFENSE COUNSEL*

During its closing argument, the People argued, "Defense counsels want[] you to believe this case is about medical marijuana. But you didn't hear any testimony about

18

that because it's irrelevant.  They want you to believe this is about medical marijuana because they think that's going to convince you to come back with a verdict of not guilty.  But the stipulation is simply not relevant because [defendants] are charged with cultivating marijuana, and they are the only defendants in this case.  Mr. Yap is not a defendant.  No members of that collective are a defendant.  The only people charged with cultivating marijuana are the people who resided at the area in the land that had the marijuana grow.  Don't be misdirected, folks.  It's the defense attorney's job to misdirect you."[11]

Mary's counsel objected on the grounds of improper argument.  The court overruled the objection.  The prosecutor continued, "Any argument about medical marijuana or the Second Amendment rights or vicious mountain lions is meant to misdirect you.  The jury instructions are meant to keep you on that path, that path of knowledge, that path of understanding, that path of wisdom."

Although we in no way condone such argument, we find no legal error in the People's single, passing statement that the job of the defense attorney is to misdirect the jury.  Indeed, the comment was less objectionable than those made by prosecutors in *People v. Breaux* (1991) 1 Cal.4th 281, *People v. Gionis*, *supra*, 9 Cal.4th 1196, and *People v. Cunningham* (2001) 25 Cal.4th 926, all of which were found to have been

---

[11] The People, on appeal, contend William forfeited this argument by failing to object below.  (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215.)  However, since Mary's counsel's objection on that same basis had already been overruled, it would have been futile to do so.  (*People v. Tully* (2012) 54 Cal.4th 952, 1037, fn. 31 [failure to object to prosecutorial misconduct may be excused where objection would have been futile].)

proper reminders the jury should focus on the evidence and not on the arguments. (*Breaux*, at pp. 305-306 [if the defense has neither facts nor law on its side, defense counsel will attempt to confuse the jury]; *Gionis*, at pp. 1215-1216 [defense counsel "arguing out of both sides of his mouth" and had engaged in great lawyering]; *Cunningham*, at pp. 1002-1003 [statement by prosecutor that defense counsel's job was to put up straw men, smoke, and red herrings].)  Thus, we hold no misconduct occurred.

### 2. *CONTENTION THAT EVIDENCE DID NOT EXIST*

During its rebuttal argument, the People argued, "Defense argues Christopher Yap could be ordered to produce receipts.  I [do not] know where he gets that from.  I know of no such ability for us to order him to bring in something like that.  What I was arguing is that if your position is that you want this jury to believe that you purchased the equipment for the collective operating lawfully, why not just bring the receipts in?  Obviously, you need to keep them because you have to charge each member of your collective their proportion[al] share.  Surely, you have records.  Why not bring them in?  Because they don't exist.  Because this was [defendants] cultivating this room."

Defendants contend the People's statement the documents did not exist constituted prejudicial misconduct.  First, neither defendant objected below; thus, the argument was forfeited.  (*People v. Tully*, *supra*, 54 Cal.4th at p. 1049 ["'Because we cannot assume that an objection and admonition would have been futile or ineffective, [defendants have] forfeited [their] appellate claim[s] of misconduct'"].)  Second, although it is technically true the People did not know for certain such documents did not exist, it is a logical inference that had Yap possessed documents that would have substantiated his testimony,

20

defendants could have adduced them at trial. There is no evidence on this record the People were apprised the documents did exist. Thus, the People were not contradicting known but excluded evidence.

Third, comments by the People on the absence of evidence adduced by the defense are not misconduct if they do not imply the defense had a burden to produce such evidence. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339-1341 ["[B]rief comments by the prosecution during closing argument noting the absence of evidence contradicting what was produced by the prosecution on several points, and the failure of the defense to introduce material evidence or any alibi witnesses" did not constitute misconduct where the People made no "improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence"].) The People made no insinuation defendants had either the burden of production or proof. Thus, the People did not commit prosecutorial misconduct by asserting documentary evidence of Yap's purchase of the equipment did not exist.

### 3.   *APPEALING TO THE PASSIONS*

In its rebuttal argument, the People argued defendants failed "to create a safe living environment free of unsecured firearms, free of narcotics, free of prescription drugs, free of fire hazards, free of dangerous smoke.  [¶]  . . . [The child] now depends on you." Mary's counsel objected on grounds of improper argument. The court overruled the objection. The prosecutor went on to argue, "He is dependent upon you now to say that that's unacceptable. When you take on the role as parent, you need to be a parent. You need to parent that child in a safe and responsible way and create a safe

21

environment. He depends on you to tell them this is unacceptable." Mary's counsel renewed his objection. The court overruled the objection again.[12]

Defendants contend the People committed prejudicial misconduct by appealing to the passions of the jury. We disagree.

It is improper for the prosecutor to appeal to the passions or prejudices of the jury, particularly with respect to invoking sympathy for the victim. (*People v. Gonzales* (2011) 51 Cal.4th 894, 952 [prejudicial misconduct where prosecutor read an "extended and melodramatic oration couched as a letter to the victim"]; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1192-1202 [prejudicial misconduct where prosecutor made repeated requests the jury put itself in the victim's shoes and invocation of "Golden Rule" even after the court's sustainment of multiple defense objections, but trial court's refusal to issue admonition].)

However, here the prosecutor made two minor and fleeting references to the victim that we cannot conclude rendered the entire trial unfair. (*People v. Medina* (1995) 11 Cal.4th 694, 759-760 [appellate court reviewing prosecutor's request the jury "'do the right thing, to do justice, not for our society, necessarily or exclusively, but for [the victim], an 18-year-old boy who was just working at a gas station one night' found "no reasonable probability that the prosecutor's brief and isolated comments could have influenced the jury's guilt determination"].) The remarks, here, are much closer to those

---

**12** The People again argue William forfeited the argument by failing to object. Again, we hold any objection would have been futile, especially here where Mary's counsel objected twice and was twice overruled.

22

in *Medina* than *Gonzales* or *Vance*; thus, we hold any misconduct did not result in prejudice to defendants.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

HOLLENHORST
Acting P. J.

RICHLI
J.

23