**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050073 |
| v. | (Super. Ct. No. 11CF0622) |
| MORRIE JAY JSAMES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

*          *          *

After Morrie Jay Jsames molested his eight-year-old niece, a jury convicted him of sexual intercourse with a child 10 years old or younger (Pen. Code, § 288.7, subd. (a); all further statutory references are to this code), and two counts of oral copulation or sexual penetration with a minor 10 years old or younger (§ 288.7, subd. (b)). The trial court sentenced him to 55 years in prison.

Defendant contends his conviction must be overturned because the police interrogated him in violation of the Fifth Amendment and *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Specifically, he argues his admissions were coerced because the officers misled him by incorrectly stating he already had an appointed attorney, but nevertheless proceeded to question him (cf. *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*)) based on his implied waiver of his *Miranda* rights. He also argues the trial court erred in concluding he impliedly waived his *Miranda* rights though he gave no express acknowledgment he understood those rights. Finally, he asserts he was entitled to an unspecified number of additional custody credits because Oklahoma authorities detained him on the charges in this matter before Garden Grove Police Department officers took him into their custody. As we explain, defendant's challenges lack merit, and we therefore affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Eight-year-old Alexandria lived with her grandmother, Joanne S., who was her legal guardian and also took care of Alexandria's older brother (Aaron) and sister (Ashley). Defendant is Joanne S.'s son, and he came to live with the family in December 2008 before Joanne S.'s knee surgery. Defendant stayed until April 2009, and during that time he moved the family to successive residences — a Glen Oaks condo, the Lemon Tree Motel, and a Garden Grove apartment — while Joanne S. recovered in the hospital.

2

On an April 2009 hospital visit to see Joanne S., Joanne S. overheard Alexandria tell defendant, "You better not rape me again." Joanne S. asked Alexandria if she knew what that meant, and Alexandria responded it is "when a man puts his thing in your vagina." Alexandria told Joanne S. that defendant raped her at the Lemon Tree Motel and the Garden Grove Apartment.

In an April 2009 forensic interview played for the jury, Alexandria explained that defendant would pull down her pants and underwear and place his "private spot" inside her private spot. He did this to her multiple times and in all three residences. In two different incidents he used his tongue to touch her "down there," and in a third he placed his hand inside her private part. Alexandria stated in the interview that defendant would get on top of her and "rape" her. Asked to explain what she meant, she described defendant's body on hers, sometimes with his penis hard and sometimes soft, "pee" would come out of his penis, and then he would wipe himself with a towel.

A medical examination came back "normal," which the doctor explained was not inconsistent with abuse where no injuries have been inflicted or they have healed by the time of the exam.

Age 13 at the time of trial, Alexandria testified that in several instances of abuse at the different residences, defendant's penis went inside her vagina. Defendant removed her underwear and would touch her vagina with his hand and once, at the Lemon Tree Motel, he inserted his fingers into her vagina.

Garden Grove Police Detective David Young extradited defendant from Oklahoma, and interviewed him at the Garden Grove police station. During the course of the interview, defendant denied showing Alexandria his penis, placing his hands inside her vagina, or ejaculating on her, but admitted he touched her twice on her vagina and did so in an attempt to arouse her. He claimed Alexandria would run by him naked after she had taken a shower, jump on him, and then he touched her in a "misconduct way." Defendant also recalled a time he said Alexandria climbed under the covers with him and

3

rubbed her butt against his penis. He then masturbated her. He acknowledged admitting to Joanne S. that he touched Alexandria when Joanne S. confronted him, and he admitted to Young that his actions were "inappropriate."

Under Evidence Code section 1108, defendant's daughter testified that when she was six years old and living with her father in New Mexico, defendant slid his hands under her pajama dress while they were watching a movie, pulled up the dress and pushed her underwear aside to insert his fingers into her vagina for two minutes. She immediately told her mother, spoke to a social worker, and testified about the incident, to which defendant pled guilty.

## II

## DISCUSSION

A. *Miranda*

Defendant contends his conviction must be overturned because "[t]he interrogating officer demonstrated [he] was willing to violate the prohibition against questioning a represented defendant without his counsel being present." We are not persuaded. As we note below, defendant did not have an attorney at the time of his interview, and the officer did not interfere with defendant's right to counsel.

After defendant waived opposition to his extradition from Oklahoma, Detective Young transported him back to Garden Grove, and conducted an interview with him at the police station. Young advised defendant at the outset of the interview: "You have the right to remain silent, anything you say may be you [*sic*: used] against you in court. You have the right to an attorney before and during questioning, if you cannot afford an attorney one will be appointed to you before questioning, if you wish. Do you understand each of these rights I've explained to you?"

The record does not disclose an affirmative verbal response from defendant, but Young continued, "Okay, okay. You understand that ah you do have, okay. The legal proceeding has already begun on you as far as ah, filing charges. That's why we

4

came and got you today. Um, um the warrant was for a[n] incident that happen[ed] in ['09] for a ah, you know what [a 288 charge] is right."

When defendant answered, "No," Young explained, "It's um, it's a molestation charge. Okay, from ['09]. *Alright you do have an attorney that is assigned to assist you*." (Italics added.) Defendant stated, "Um huh," and Young continued: "Um, if you decide to talk to me without him being present. That's up, strictly up to you. Okay, um would you be willing to talk to me about these charges." Defendant gave no express answer, but he and Young engaged in brief small talk that included defendant laughing for a reason that is not clear in the record.

Then, when Young pinned down the time frame ("Back in two thousand nine," "um, I believe it was in April") that an officer had come out to defendant's residence to investigate abuse allegations, defendant and Young continued their colloquy. During the interview, he made several admissions, including that he touched Alexandria twice on her vagina, which he admitted was an attempt to "arouse" her, and he admitted he touched her in a "misconduct way" after she took a shower and he claimed she jumped on him.

As defendant correctly notes, once criminal proceedings have commenced and a defendant gains the assistance of counsel, officers may not interrogate the defendant outside counsel's presence. (*Massiah*, *supra*, 377 U.S. at p. 206.) The *Massiah* rule safeguards a defendant's Sixth Amendment right to counsel. (*Ibid.*) The trial court here found defendant had not been appointed counsel at the time Young questioned him, and defendant does not suggest the court erred in that conclusion.

Defendant contends, however, that by incorrectly stating "you do have an attorney," Young violated his rights under the Fifth Amendment and *Miranda* to be free from coercive questioning because Young demonstrated "that he was *prepared to* violate [defendant's] Sixth Amendment right to counsel as provided in *Massiah*" *if* defendant had an attorney. (Italics added.)But defendant's attempt to transform what he concedes

was *not* a Sixth Amendment violation into a Fifth Amendment and *Miranda* violation fails for the simple reason that there was no police wrongdoing or overreaching. (*Colorado v. Connelly* (1986) 479 U.S. 157, 164-166.) Simply put, Young did not violate defendant's *Massiah* right to counsel because he had not yet retained or been appointed an attorney.

Defendant's position boils down to the premise that it is coercive to ask someone to waive their *Miranda* rights when they know for certain they could have an attorney's aid before questioning. But that turns the informative nature of *Miranda* warnings on their head. While, as Young acknowledged in his pretrial testimony, it may be more likely a lay defendant rather than his or her attorney will consent to waive *Miranda* protections, it remains the defendant's right to do so. We discern nothing coercive in Young telling defendant he had an attorney.

It appears Young may have meant, as he had stated previously, that defendant was entitled to an attorney "if you wish." But as the trial court found, Young's mistake in stating affirmatively that defendant had an attorney may have reinforced that defendant's *Miranda* rights were real, immediate, and not merely prospective, yet he nevertheless waived them. On constitutional claims of this nature, we defer to the trial court's view of the facts, but independently review whether the defendant's statements were illegally obtained. (*People v. Storm* (2002) 28 Cal4th 1007, 1022-1023.) We find no coercion in the record, and therefore reject defendant's contrary claim.

Defendant also argues that because he did not affirmatively state he understood his *Miranda* rights, the trial court erred in finding he impliedly waived those rights. He points to no authority requiring an express statement of understanding. To the contrary, just as a *Miranda* waiver "may be implied" through the defendant's failure to invoke the right to remain silent and the right to counsel, "'coupled with an understanding of his rights and a course of conduct indicating waiver'" (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 (*Berghuis*)), the defendant's understanding may be

6

inferred from the totality of the circumstances in the record (*id.* at p. 385).  For example, in *Berghuis*, the defendant declined to sign a form stating he understood his rights, and the detective equivocated about whether he asked the defendant for verbal confirmation he understood his rights.  (*Id.* at p. 375.)  On its independent review, the high court determined "[t]here is no basis in this case to conclude [the defendant] did not understand his rights; and on these facts it follows that he chose not to invoke or rely on those rights when he did speak." (*Id.* at p. 385.)

The same is true here.  Nothing suggests defendant did not understand his *Miranda* rights when Young read them to him.  While defendant did not verbalize his understanding, Young's statements after he read defendant his rights ("Okay, okay.  You understand that ah you do have, okay") suggest defendant may have provided nonverbal cues that he acknowledged and grasped Young's recitation of those rights.  In any event, defendant was in his mid-50's, and nothing indicated he failed to understand English or that he spoke any other language.  He points to nothing in the record suggesting any cognitive difficulties, nor that he was under the influence of any kind.  (See *People v. Breaux* (1991) 1 Cal.4th 281, 301 [a suspect who has ingested drugs or alcohol may nevertheless provide a valid waiver if he understands his rights].)  Defendant makes no argument that he did not understand his rights, pointing instead only to the absence of an express acknowledgement.  But as discussed, that is not required.  Accordingly, the trial court did not err in finding a valid *Miranda* waiver.

B.    *Custody Credits*

For the first time on appeal, defendant asserts he is entitled to an unspecified number of presentence custody credits because Oklahoma authorities took him into custody on the California arrest warrant a week or so earlier than the date reflected in his probation report for his arrest and transport from Oklahoma by the Garden

Grove officers: March 23, 2011. The probation officer and the trial court used the March 23d date to calculate defendant's credit of 1130 days in actual custody.

The Attorney General suggests we remand the matter for the trial court to determine his initial custody date pending extradition, for which he is entitled to credit. (*In re Watson* (1977) 19 Cal.3d 646, 650-651.) But neither the Attorney General nor defendant address section 1237.1, which provides: "No appeal shall be taken by the defendant from a judgment of conviction on the ground of an error in the calculation of presentence custody credits, unless the defendant first presents the claim in the trial court at the time of sentencing, or if the error is not discovered until after sentencing, the defendant first makes a motion for correction of the record in the trial court, which may be made informally in writing." (See *People v. Fares* (1993) 16 Cal.App.4th 954, 957 [dismissing appeal where sole issue raised was custody credits, without § 1237.5's requisite motion in the trial court: "We are disturbed that this attempt at a minor [computational] correction of [an alleged] sentence error has required the formal appellate process"].)

True, there is authority that when, as here, additional issues are raised on appeal and the credit issue is merely "ministerial" and easily resolved, the "legislative intention that principles of judicial economy be advanced by the enactment of [section 1237.5]" did not require "a rule where publicly compensated lawyers are flying up and down the state for hearings on motions when the same issue can be succinctly raised on direct appeal in a less costly fashion." (*People v. Acosta* (1996) 48 Cal.App.4th 411, 426-427 (*Acosta*).) *Acosta* does not aid defendant, however, because he presents no request based on the record for a ministerial correction of his custody credits; instead, he seeks remand. But where no plain correction is possible on appeal, section 1237.5 first requires him to make a motion in the trial court if he believes he is entitled to additional custody credits.

## III

## DISPOSITION

The judgment is affirmed.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.